E357INT1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   INTELLECTUAL VENTURES II LLC,

4                   Plaintiff,

5           v.                              13 Civ. 3777 (AKH)

6   JP MORGAN CHASE & CO.,

7                   Defendant.

8   ------------------------------x

9                                          March 5, 2014
                                           10:15 a.m.
10
    Before:
11
                    HON. ALVIN K. HELLERSTEIN
12
                                           District Judge
13
                        APPEARANCES
14
    FEINBERG DAY ALBERTI & THOMPSON LLP
15       Attorneys for Plaintiff
    BY:  DAVID ALBERTI
16       SAL LIM
         JAKE ZOLOTOREV
17
    DUNNEGAN & SCILEPPI LLC
18       Attorneys for Plaintiff
    BY:  WILLIAM DUNNEGAN
19
    DONTZIN NAGY & FLEISSIG LLP
20       Attorneys for Defendant
    BY:  TIBOR NAGY
21
    DURIE TANGRI LLP
22       Attorneys for Defendant
    BY:  CLEM ROBERTS
23
    KIRKLAND & ELLIS LLP
24       Attorneys for Defendant
    BY:  KENNETH ADAMO
25       BRENT RAY

E357INT1

```
 1              (In open court)

 2              THE COURT:  Good morning.  Be seated.  Intellectual

 3   Ventures.  You're Mr. Lim?

 4              MR. LIM:  Yes, your Honor.

 5              THE COURT:  Introduce your colleagues, please.

 6              MR. LIM:  Sure.  Your Honor, my name is Sal Lim with

 7   Feinberg Day Alberti & Thompson.  With me is David Alberti and

 8   Jake Zolotorev of Feinberg Day Alberti & Thompson.  And

 9   Dunnegan is our local counsel.  And with us are our clients,

10   Melissa Finocchio and Cris Leffler.  And also with us is our

11   technician that is going to be helping us with the

12   presentation.

13              THE COURT:  Most valuable person here.  And his name

14   is?

15              MR. LIM:  Michael --

16              MR. SKRZYPEK:  -- Skrzypek.

17              THE COURT:  Good morning, all.

18              MR. NAGY:  Your Honor, Tibor Nagy with Dontzin Nagy

19   here for defendants.

20              THE COURT:  How do you spell your name, Mr. Nagy?

21              MR. NAGY:  N-a-g-y, your Honor.  And with me from

22   Durie Tangri is Clem Roberts, and from Kirkland & Ellis, Mr.

23   Adamo, Ken Adamo, and Brent Ray.  Our client is here as well,

24   Michael Pearce.  And we too have a technology assistant with

25   us, Scott Watson.
```

E357INT1

| | |
|---|---|
| 1 | THE COURT:  Mr. Pearce, if you wear a jacket, you can |
| 2 | come up to counsel table. |
| 3 | MR. PEARCE:  I'm fine here. |
| 4 | THE COURT:  All right.  That's everybody? |
| 5 | I have received the Elcommerce.com, Inc. case decided |
| 6 | by the Federal Court of Appeals sent to me by Mr. Alberti. |
| 7 | I've read it. |
| 8 | I think there is a contest going on between the |
| 9 | federal Court of Appeals and some of the district courts about |
| 10 | how much clarity is required under Section 112.  I was reversed |
| 11 | in a case called Biosig v. Nautilus in the federal Court of |
| 12 | Appeals, and the Supreme Court has granted certiorari.  I don't |
| 13 | know if it will get up there this term or next term, but I |
| 14 | think we'll have some Supreme Court clarification.  Whether |
| 15 | that's a clarification or further obfuscation will await |
| 16 | history, but the Supreme Court will deal with the issue of |
| 17 | Section 112 and the scope and reach and command. |
| 18 | What I'd like to do, if it makes sense to both of you, |
| 19 | is to go down the terms in issue one by one and hear the |
| 20 | contentions of interpretation, and see if I could suggest what |
| 21 | I believe would be a Markman construction to define the case. |
| 22 | We will do this as we go along, and eventually the submission |
| 23 | that both of you made jointly -- which I appreciate very |
| 24 | much -- with my construction will be the order that will issue |
| 25 | in this case. |

E357INT1

1              All right.  So, let's begin with the O84 patent.  And

2      I think we will have in all these cases have Mr. Lim speak

3      first for Intellectual Ventures and Mr. Nagy second, or members

4      of your respective teams.

5              So, the first term in dispute is what is meant by an

6      anomaly.  Intellectual Ventures suggests that the plain meaning

7      is sufficient.  JP Morgan Chase suggests that the proper

8      definition would be a "predetermined pattern of data".  I would

9      suggest "an unusual or unexpected pattern of data".

10             Comments?

11             MR. LIM:  That's fine with us, your Honor.

12             THE COURT:  Mr. Nagy?

13             MR. NAGY:  Your Honor, "unusual or unexpected" we

14     think could be problematic, and the reason, Judge, is because

15     there are anomalies that are neither.  In this particular --

16             THE COURT:  Neither unusual or unexpected.

17             MR. NAGY:  Exactly, your Honor.

18             THE COURT:  How about aberrational, or irregular?

19             MR. NAGY:  Same issue, your Honor.  And if I might,

20     your Honor --

21             THE COURT:  Anomaly is not predetermined.

22             MR. NAGY:  Your Honor, if I might on that point, we

23     believe that in this patent it has to be, and the reason it has

24     to be is because the anomalies at issue here are things that

25     you tell the system to look for.  Something can't be unusual in

E357INT1

1    a computer if you don't tell the computer what usual is.  It

2    can't be unexpected if you don't tell the computer what

3    expected is.

4            And every single claim in this patent, your Honor, all

5    of them, have one term in common.  And if I could, your Honor,

6    can we get slide 9 up, please?

7            Slide 9, your Honor, is claim 1 of the patent.  And in

8    blue, Judge, is a phrase that's in every single one of the 33

9    claims at issue here:  Detecting an anomaly in the network

10   computer system using network-based intrusion detection

11   techniques comprising, analyzing data.

12           And we put "network-based intrusion detection

13   techniques" in italics for your Honor because those are things

14   that were preexisting.  This patent doesn't say it invented

15   those techniques; instead it says use those techniques

16   differently.  And it gives the reader examples of those

17   techniques, three examples in the specification.

18           The one commonality to all of those techniques, Judge,

19   is they all use predetermined patterns of data.  They have to.

20   Because if you didn't say look for this, the system that's

21   claimed in this patent wouldn't know what to look for.  It

22   can't come up with something and say, oh, that looks out of the

23   ordinary.

24           I will give your Honor another example.  There is

25   something in this patent called address spoofing.  That is one

E357INT1

1  of the examples that is given of the type of anomaly you would

2  be looking for.  But it is neither unexpected, nor unusual, nor

3  an aberration.  In fact, the patent, if you would go to the

4  next slide, please, take us to 15.

5       Address spoofing, your Honor is something you expect.

6  The very reason you would use this patent in this system is

7  because you are expecting to get attacks like this, and when

8  you get them they look completely ordinary; there is nothing

9  unusual or aberrational about them.

10      THE COURT:  I will define it as an irregularity in the

11  data.  That's my tentative ruling, to be reexamined when we

12  complete the whole process.  OK?  An anomaly does not have to

13  be predetermined.  It may arise in many different

14  circumstances, but an anomaly connotes something that is

15  irregular.

16      MR. NAGY:  Thank you, your Honor.

17      THE COURT:  An irregularity in the data.

18      The second term in controversy is "Network based

19  intrusion detection techniques."

20      Intellectual Ventures suggests "Techniques for

21  detection of intrusions by analysis of events which happen in a

22  communications network to which the detecting device is

23  attached."

24      JP Morgan suggests "Techniques for determining that a

25  breach of computer security has occurred, is underway, or is

7

E357INT1

1    beginning based on analysis of network communications".

2              My suggestion is "Techniques for detecting by

3    analyzing network communications whether unauthorized computers

4    have entered a network."

5              "Techniques for detecting by analyzing network

6    communications, whether unauthorized computers have entered a

7    network."

8              Mr. Lim?

9              MR. LIM:  I think that would be acceptable to us, your

10   Honor.

11             THE COURT:  I'm sorry?

12             MR. LIM:  I think that would be acceptable.

13             THE COURT:  Mr. Nagy?

14             MR. NAGY:  Your Honor, it's largely acceptable except

15   for the last part, and let me show you why.

16             THE COURT:  Just tell me what you'd like.

17             MR. NAGY:  Sure, your Honor.  We would like for

18   detection "that a breach of computer security has occurred, is

19   underway, or is beginning".

20             And the reason, your Honor, is your construction as

21   proposed would eliminate an intrusion attempt, whereas that's

22   clearly contemplated by the specification.  When you say

23   "enter," that would exclude an attempt to enter, it would

24   exclude reconnaissance activity, and so we need that broader

25   language.

E357INT1

1          THE COURT:  So we can say "have entered" or "are

2    seeking to enter".

3          MR. NAGY:  Again, your Honor, still too limited.  It

4    would not include, for example, necessarily reconnaissance

5    activity where you are not trying to enter, you are just doing

6    reconnaissance.  And that is right in the specification.

7          And this phrase here, your Honor, that we have "has

8    occurred, is underway or is beginning" --

9          THE COURT:  What do you want?

10          MR. NAGY:  We would like "A breach of computer

11    security has occurred, is underway, or is beginning".

12          MR. LIM:  Your Honor, may I respond to that point?

13          THE COURT:  Yes.

14          MR. LIM:  Yes.  Can I have slide number 7, please.

15          THE COURT:  We are going off the record so that we can

16    try to create interchangeability of files for easier display.

17          MR. LIM:  Thank you, your Honor.

18          THE COURT:  Off the record.

19          (Recess)

20          MR. LIM:  May I proceed, your Honor?

21          THE COURT:  Go ahead.

22          MR. LIM:  Your Honor, the point I was going to make is

23    that with respect to this particular term, I want to draw the

24    court's attention to independent claim number 26, dependent

25    claim 30, as well as 31.  As you can see, your Honor, there are

E357INT1

1    various additional limitations that's added by the dependent

2    claim into the -- that we incorporated into the independent

3    claim through the adding the independent claim limitations to

4    the dependent claim limitations.

5            And with respect to anomaly, as can you see, anomaly

6    comprises use of intrusion, intrusion attempts and

7    reconnaissance activities.  I think that's what counsel is

8    getting at.

9            But If you look further down at the additional

10   limitation of 31 includes the detection of data packets with

11   respect to predetermined patterns.  So, the dependent claims

12   recites these various activities that are in question.

13           And I think the prior construction provided by your

14   Honor sufficiently covers the term for network based intrusion

15   detection techniques.

16           THE COURT:  So, what do you suggest?

17           MR. LIM:  It's precisely what your Honor read off to

18   us the first time, your Honor.

19           THE COURT:  It's very dangerous to tell me that you

20   agree with me and elaborate, because I could be persuaded

21   against you.  If I say something you agree with, just say you

22   agree.  You don't need to support my reasoning.  Thank you, Mr.

23   Lim.

24           The definition will be the following:  "Techniques for

25   detecting by analyzing network communications, whether

E357INT1

1    unauthorized computers have entered or are seeking to enter a

2    network, or are conducting reconnaissance activities..."

3              MR. NAGY:  Thank you, your Honor.

4              THE COURT:  The third controversial term is between

5    the claim that says "plurality of hosts, servers and computer

6    sites in the networked computer system".

7              Intellectual Ventures suggests interpretation of terms

8    is not required.  JP Morgan suggests "multiple hosts, servers

9    and/or computer sites within a computer network".  I will adopt

10   JP Morgan's suggestion.

11             MR. LIM:  Your Honor, may I be heard on that point?

12             THE COURT:  Yes.

13             MR. LIM:  Can I go to slide 14, please.

14             THE COURT:  Yes.

15             MR. LIM:  Your Honor, as recited in claim 1 and

16   independent claim 26, the precise claim term in question "a

17   plurality of hosts, servers and computer sites," the key word

18   here is the claim language uses the word "and," and Chase is

19   seeking to change the word "and" to an "or".  And the reason

20   that would not make sense --

21             THE COURT:  It's in the disjunctive, "and" or "or".

22             MR. LIM:  It is disjunctive, so it could be broad

23   enough to cover a system where there are two or more computer

24   hosts.

25             THE COURT:  You want "hosts, servers and computer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E357INT1

1    sites" to be in the conjunctive.

2             MR. LIM:  Right.

3             THE COURT:  Any objection to that, Mr. Nagy?

4             MR. NAGY:  I do, your Honor.  There are a number of

5    objections.  The first is it excludes one of the embodiments

6    that's in the specification itself.

7             Take us, if you would, to our presentation slide 36.

8             THE COURT:  Let me see the preview.

9             Let me ask, if it's "and" or "or," you've got breadth

10   more so than in the claim.  Why should you object?

11            MR. LIM:  I'm sorry, your Honor?

12            THE COURT:  If you have "and" or "or," either

13   conjunctive or disjunctive, you've got breadth more so than

14   conjunctive alone.  Why should you object?

15            MR. LIM:  We respectfully submit that the claims are

16   the narrow scope.  In other words, the network based intrusion

17   techniques is talking about multiple hosts, multiple servers

18   and multiple computer sites.

19            THE COURT:  I got it.

20            Mr. Nagy, go ahead.

21            MR. NAGY:  Thank you, your Honor.

22            Slide 31 of our set, please.  No, that's not slide 31.

23   That's slide 31.

24            Your Honor, let me start by showing you where we got

25   our construction.  We took it right out of the file history;

E357INT1

1   it's that underlying language there.

2           Now let me show your Honor why IV's insistence on

3   having an "and" before each one just wouldn't work.

4           Can we go to slide 36, please.

5           THE COURT:  I have seen enough.  It's going to be

6   "and" or "or".

7           MR. NAGY:  Thank you, your Honor.

8           Is there an objection on using multiple rather than

9   plurality?

10          MR. LIM:  No objection to that, your Honor.  If I may

11   be heard on the and/or on one more point.

12          THE COURT:  No, we have enough.

13          Point 4.  "Pattern correlations across the plurality

14   of hosts, servers, and computer sites".

15          Intellectual Ventures suggests "recognition of anomaly

16   signatures across the plurality of hosts, servers and computer

17   sites.

18          JP Morgan suggests "a pattern in the data from

19   multiple hosts, servers, and/or computer sites.

20          I suggest "analysis of patterns of data across

21   multiple hosts, servers, and/or computer sites".

22          MR. NAGY:  No objection on our end, your Honor.

23          MR. LIM:  No objection, your Honor.

24          THE COURT:  5.  Alerting the devices/alerts the

25   devices.

E357INT1

1          Intellectual Ventures argues plain meaning.  JP Morgan

2     suggests "notifying the device, an associated firewall, or

3     administrator".

4          Can I see the claim itself?

5          MR. NAGY:  Your Honor, just one note there.  It's

6     claims 15 and 16 that specifically also include certain of the

7     language.  There are 33 claims in the patent, so looking at

8     just claim 1 would not give you the whole picture.

9          THE COURT:  All right.  Look at claim 1 first and then

10    15 and 16.  OK.  Now let's look at 15 and 16.

11         MR. NAGY:  And that's claim 9 for now.  Can we get in

12    15 and 16?

13         THE COURT:  15 is up.  And now 16.

14         I'm stopping on this slash between "alerting the

15    devices" and "alerts the devices".  I guess you're defining

16    both those terms.  Is that what it is?

17         MR. NAGY:  Yes, your Honor.  They happen to come up

18    with alerting and alerts.  That's all.

19         THE COURT:  I don't think there needs to be any

20    definition.  I think the plain meaning is sufficient.

21         MR. NAGY:  Your Honor, may I be heard briefly on that?

22         THE COURT:  Yes.

23         MR. NAGY:  Your Honor, when we first saw this -- and

24    we can understand why you think the plain meaning might work --

25    but "alerts the devices" is really just not limited to devices.

E357INT1

1           I might alert your Honor, for example, to an emergency

2       by picking up the phone and calling you, but if you are on

3       trial, maybe that won't work.  I might also alert you by

4       calling your wife or calling your secretary.  I still would be

5       alerting you.  And that's what this patent says.

6           And, your Honor, as you can see on our slide 47 --

7           THE COURT:  Before you show it, let me just see the

8       last slide that was shown.

9           MR. NAGY:  You can see, your Honor, here --

10          THE COURT:  Can you stop talking?

11          MR. NAGY:  I'm sorry, Judge.

12          THE COURT:  I will adopt JP Morgan's suggestion.

13          MR. NAGY:  Thank you, your Honor.

14          MR. LIM:  Your Honor, might I be heard on that point?

15          THE COURT:  Yes.

16          MR. LIM:  The slide you are looking at right now it's

17      dependent claim 16.

18          Can I have the prior slide, please.

19          The prior slide illustrates the fact that the

20      "alerting a firewall associated with a device" -- which is

21      exactly what JP Morgan Chase proposed -- is in a dependent

22      claim 15.  So if their construction is adopted, that limitation

23      of the dependent claim 15 is now read into the independent

24      claim 9 through the construction of alerting device.

25          THE COURT:  The focus is on alerting.  The patent is

E357INT1

1   dealing with the automated feature of the function of alerting.

2   How the alert takes place, according to my understanding, is

3   not important to the patent construction.

4                MR. LIM:  Well, what is being --

5                THE COURT:  Am I right?

6                MR. LIM:  I'm sorry.

7                THE COURT:  Am I right?  You're not claiming who was

8   alerted; you're claiming that there is a technique in sensing

9   the anomaly.

10               MR. LIM:  That's correct.  But, your Honor, the claim

11  makes clear what is being alerted does not include the

12  administrator in this particular claim limitation.

13               Please give me the next slide.

14               The next slide is another dependent claim off of 9,

15  and there the further added limitation of 16 refers to an

16  administrator of the device.

17               THE COURT:  I've heard enough.  I'm accepting JP

18  Morgan's suggestion.

19               6.  Sense data.

20               JP Morgan's suggestion is "detect data traffic or

21  audit trail records".

22               I don't think the term needs interpretation.

23               7.

24               MR. NAGY:  Your Honor, may I be heard briefly on that?

25               THE COURT:  Yes.

E357INT1

1          MR. NAGY:  That may be fine by us, but we started off

2     here --

3          THE COURT:  So if it's fine, don't argue.

4          MR. NAGY:  It may be, your Honor.

5          THE COURT:  Why don't you think about it before you

6     speak.  If it's all right, then let's move on.  We don't need

7     to have contentions about every one.

8          MR. NAGY:  On second thought, your Honor, I think it's

9     fine.

10          THE COURT:  Thank you.  Then there are nine terms.

11     There is no 7 here.  The proposal has a box for 7 but there is

12     nothing there.

13          So, there are six points of construction that are in

14     contention, and I resolved those six.

15          Now we move on to constructions resolved by agreement.

16     I accept all those.

17          That finishes the 084 patent.  We are now on the 409

18     patent.  Here is how I introduce the subject:

19          "This patent is a method for limiting access to

20     sensitive data.  Sensitive data is encrypted and then sent with

21     rules limiting who can access the data.  (The rules can be sent

22     either together with the encryption or separate."  Different

23     people may be given different access to data for different

24     purposes.

25          "Plaintiffs and defendants disagree about whether the

E357INT1

1  patent involves encryption.  Plaintiffs argue that "protected

2  data" is encrypted, "unprotected data" is decrypted, and the

3  patent covers what happens to the data after it has been

4  decrypted.  Defendants however contends that the data remains

5  encrypted and the patent concerns a method for decrypting the

6  data every time it is accessed."

7          Comments?

8          MR. ROBERTS:  So, on behalf of the defendants, your

9  Honor, that's not fully right.  First, I think we have

10 agreement that the patent involves encrypting and decrypting

11 data, and that the protected data is encrypted and the

12 unprotected data is decrypted.  And I think we actually have

13 agreement between the plaintiffs and the defendants on that

14 subject.

15         THE COURT:  Is that true, Mr. Lim or Mr. Alberti?

16         MR. ALBERTI:  Yes, your Honor, it is true that we both

17 agree that when we talk about protected and unprotected we are

18 indeed talking about encrypted and unencrypted or decrypted

19 data.

20         THE COURT:  All right.  So, there is no contention on

21 that issue.

22         So I should say that "the patent provides that

23 protected data is encrypted and that unprotected data is

24 decrypted," and stop there.

25         MR. ROBERTS:  I would say that unprotected data is

E357INT1

1    unencrypted because it may be, your Honor, that unprotected

2    data has not yet been encrypted.

3            THE COURT:  I think you're right, I think unencrypted

4    is better.

5            Let me deal with the disputes.

6            First is "openly distributed data".

7            Intellectual Ventures suggests "data transmitted over

8    an insecure communication channel".

9            JP Morgan:  "Data transmitted using mechanisms and

10   media which may be subject to access and copying by third

11   parties".  I would adopt Intellectual Ventures'.

12           MR. ROBERTS:  Thank you, your Honor.  If I may --

13           THE COURT:  Sorry.  Go ahead, Mr. Roberts.

14           MR. ROBERTS:  Yes, I was going to comment on that.

15           If I could have our slide 6, please.

16           Slide 6, your Honor, is a passage that everybody looks

17   at.

18           THE COURT:  You are Mr. Roberts, right?

19           MR. ROBERTS:  Yes, your Honor.  It says information

20   can be transmitted openly, that is, using mechanisms and media

21   that are subject to access and copying, in other words,

22   communication channel may be insecure.

23           In our view what the patent requires when it talks

24   about openly distributing data is sending it out into the world

25   openly, without regard to the security status of the method of

E357INT1

1    communication.  It's broadcasting it.

2            You don't need to know for a fact that the

3    communication channel over which you are sending the data is

4    insecure; you are simply distributing it openly to all comers.

5    Some of those people may be secure; some of those people may be

6    insecure.

7            THE COURT:  Let's say I take out "insecure".  "Openly

8    accessible communications channel".

9            MR. ROBERTS:  What we had proposed as a compromise was

10   to combine our two language, your Honor.  "Data transmitted

11   over one or more communication channels which may be insecure,

12   (i.e., transmitted using mechanisms and media subject to access

13   and copying by third parties)".

14           And that literally takes the language which is in

15   slide 6 directly.  It reverses the order, but it's literally

16   that same language.

17           THE COURT:  I will adopt the following:  "Data

18   transmitted over an openly accessible communications channel".

19           MR. ALBERTI:  We agree, your Honor.

20           THE COURT:  2.  Rules defining access rights.

21           Intellectual Ventures suggests "rules corresponding to

22   data for controlling access to the data".

23           JP Morgan:  "Permissions governing access".

24           I suggest:  "Rules governing who has permission to

25   access the data".  Simplify it.  "Rules governing who may

E357INT1

1    access data".

2            MR. ALBERTI:  Your Honor, I would suggest a slight

3    modification of that, and I would suggest "rules governing

4    access to the data".

5            The reason I say that is because not all rules relate

6    to a particular individual.  There are rules that say, for

7    example, you can only access the data for a certain given

8    period of time, or you can only access the data under certain

9    conditions irregardless of who the actual person is.

10           THE COURT:  How about this:  "rules governing who, how

11   and when access data".

12           MR. ROBERTS:  Actually, if your Honor is attracted to

13   "rules" rather than "permissions," I would be willing to agree

14   to "rules governing access to the data," which is what opposing

15   counsel proposed.  We had thought that --

16           THE COURT:  OK, let me get it then.  "Rules

17   governing" --

18           MR. ROBERTS:  -- "access to the data".

19           MR. ALBERTI:  We would agree with that, your Honor.

20           THE COURT:  Adopted.

21           3.  At least one low level effectively defines a

22   virtual machine.

23           Intellectual Ventures suggests that "the parties agree

24   that 'at least one low level' refers to 'a level in a computer

25   system below a high-level application environment'".

E357INT1

1          JP Morgan suggests the agreement as follows:  That "at
2     least one low level refers to a level in a computer system
3     below a high-level application environment".
4               MR. ROBERTS:  Your Honor, may I clarify this?
5               THE COURT:  Yes.
6               MR. ROBERTS:  So the parties agree about what "at
7     least one low level is," i.e., a low level is a level below the
8     application environment.
9               THE COURT:  Here is what I would like to do, which I
10    think consolidates both and simplifies it:  "a level within a
11    computer system below a high-level application environment".
12              MR. ALBERTI:  Your Honor, the issue that we take with
13    that is it never addresses what an actual virtual machine is.
14              That construction does address, and the parties agree,
15    that at least one low level is a level in a computer system
16    below a high-level application environment.  However, a virtual
17    machine has a meaning that's one of ordinary skill in the art
18    would understand.  It's basically a software-based
19    implementation of a computer, and that is not reflected
20    within --
21              THE COURT:  No, it's not, you're right.
22              MR. ROBERTS:  And, your Honor --
23              THE COURT:  Let's stop a minute.  When defining these
24    terms I have to imagine how a jury is going to understand this
25    at the end of the case, if we have to go that way.  That's a

E357INT1

1    fine definition, but a jury will not understand it, so let's

2    get something simpler for virtual machine.

3           I think we are agreed on the first part, "a level

4    within a computer system below a high-level application

5    environment".  Let's do the second part.

6           MR. ROBERTS:  Can we have slide 24?

7           Your Honor, what slide 24 says -- and this is from the

8    specification -- it says "Typical computer systems are

9    implemented at various levels, each level effectively defining

10   a different virtual machine."

11          What we think that means is that in terms of this

12   patent, each level defines, constitutes, sets the metes and

13   bounds of a different virtual machine.  That's what the

14   specification says literally.

15          So, we think that when it says "at least one low level

16   effectively defining a virtual machine," what's important to

17   tell the jury is this is the thing that defines the virtual

18   machine.  And the parties agree on what that thing is, and that

19   is why we have proposed our construction.  We don't think you

20   need a separate construction for virtual machine.

21          THE COURT:  What is a virtual machine?

22          MR. ROBERTS:  In this patent a virtual machine is

23   synonymous with a level within the stack of the computer system

24   operating system.  It's each level shown in the drawing on the

25   right-hand side of the figure on your screen.

E357INT1

1          THE COURT:  I still don't understand what a virtual

2     machine is.

3          MR. ROBERTS:  So, your Honor, if you would like the

4     parties to take the term virtual machine and come become and

5     propose a separate construction of that term, I'd be willing to

6     do that, and we could submit it to you on the briefing.

7          THE COURT:  Why don't the two of you talk together

8     right now.  We will go off the record.

9          MR. ROBERTS:  OK.

10          (Pause)

11          MR. ROBERTS:  We have reached an agreement that a

12     virtual machine separately can be defined as a software process

13     that emulates another process or computer.

14          THE COURT:  And as I would understand, an example of

15     that is if I have an Apple product and it's configured to run

16     Microsoft, it then appears to be a Microsoft product.

17          MR. ALBERTI:  That's a perfect example, actually, yes.

18          THE COURT:  OK.  So the definition will be "a level

19     within a computer system below a high-level application

20     environment.  A virtual machine is a software process that

21     emulates another software process or computer".

22          The next claim term is "means for outputting".

23          Intellectual Ventures suggests "outputting the images

24     represented by the accessed data or outputting the output

25     signal represented by the accessed data".

E357INT1

1          JP Morgan suggests "outputting the images represented

2    by the accessed data or outputting the output signal

3    represented by the accessed data".

4          MR. ROBERTS:  Your Honor, what you just read is -- the

5    parties agree on the function of this term.  It's a mean plus

6    function term, and the parties agree on the function.  The

7    disagreement is on the structure.  They say the structure is a

8    display, monitor or --

9          THE COURT:  Well, I think the JP Morgan is a little

10   easier to understand, so I will adopt that.  Then we can focus

11   on the structure.

12         MR. ROBERTS:  Thank you, your Honor.  The structure,

13   they say the structure is a display, monitor or printer.  We

14   say it is the IO controller.  I will just present my brief

15   argument on it.

16         If we could have slide 32, please.

17         This is the drawing given in the specification that

18   both parties rely on.  The line in red, the line 167 defines

19   the boundary for the components of the access mechanism 114.

20   The thing that outputs the data from that boundary is the IO

21   controller shown in yellow.  The devices shown to the left --

22   if we can see slide 36, please -- those devices are peripheral

23   devices; they are external devices to the claimed invention.

24   The claims call for a device which outputs data, that's the IO

25   controller, and that data goes to printers, monitors and other

E357INT1

1    items which then can print or output it in different ways.  So,

2    the means for outputting from the device that is the subject of

3    the invention is the IO controller itself.

4            To be fair, there are some embodiments where the

5    claims call for the invention to be embodied within a printer

6    or monitor, but even then the claims cannot be construed as

7    they propose.

8            If we could have, for example, slide 38.

9            THE COURT:  I am getting too much information, and I

10   am not focusing.  Go back one slide, please.

11           MR. ROBERTS:  If you go to slide 36, your Honor, what

12   you will see is --

13           THE COURT:  No, go back one more.

14           MR. ROBERTS:  One more.  32, please.

15           THE COURT:  So, number 165 you say is the controller.

16           MR. ROBERTS:  Yes, 165 is the IO controller.  And OI

17   stands for input/output.

18           THE COURT:  The input/output controller.

19           MR. ROBERTS:  And it is therefore the means for

20   outputting; it is the thing that controls outputting, as its

21   name suggests.

22           THE COURT:  So the information comes from the left to

23   the right?

24           MR. ROBERTS:  The information in this drawing comes

25   from the right, it comes from the access mechanism.  It is

E357INT1

1    output via 165, and it flows to the peripheral devices on the

2    left.

3            THE COURT:  So I would think that box 165 would be

4    both input and output.

5            MR. ROBERTS:  It is.  I am not disputing that it also

6    would be -- if there were a means for inputting -- that it

7    would probably be that corresponding structure as well.  It may

8    do other things.  But it is clearly the mechanism pointed to in

9    the specification for outputting information from the access

10   mechanism 114 surrounded by line 167.

11           THE COURT:  All right.  So I think your suggestion

12   would translate in function generating an output signal from

13   the access data.

14           MR. ROBERTS:  Well, the parties have agreed on the

15   function, your Honor.

16           THE COURT:  Yes, I see that.  So I should just accept

17   that.

18           MR. ROBERTS:  We would appreciate it.

19           THE COURT:  All right.  And for structure, you say

20   there is no corresponding structure?

21           MR. ROBERTS:  We say that the corresponding structure

22   for the means for outputting is the IO controller, because that

23   is what outputs the data from the device.

24           THE COURT:  And what does Intellectual Ventures say?

25           MR. ALBERTI:  Your Honor, we say you have to key in on

E357INT1

1    what the agreed function is.

2                THE COURT:  What do say?

3                MR. ALBERTI:  We say it's the display monitor or

4    printer, because the function is outputting images.  An IO

5    controller doesn't output images.  A monitor -- what I am

6    looking at right now -- a display certainly outputs an image.

7    If an image is on paper, a printer will certainly output an

8    image.  An IO controller simply does not output an image.  And

9    what is discussed in the patent, the things that actually

10   output images are printers and displays.

11               THE COURT:  Well, if the function is generating the

12   output signal from the access data --

13               MR. ROBERTS:  You are looking at a different term,

14   your Honor.  There are two:  There is a means for outputting

15   and a means for generating.

16               THE COURT:  I'm sorry.  Excuse me.

17               The means for generating, as I understand this

18   diagram -- and the slide is number --

19               MR. NAGY:  -- 37, your Honor.  And it's figure 8 of

20   the patent.

21               THE COURT:  -- is that the different boxes on the

22   right-hand side stimulate potentially a message that passes

23   through the controller, and it's the controller that is the

24   device that generates the informational signal that passes on

25   to the information on the left, of which one is a printer.  The

E357INT1

1    printer is reactive.  The printer will print that which the

2    controller instructs it to print.

3              So, if we are talking about outputting, which is the

4    means, the appropriate device is the controller and not the

5    display, monitor or printer.  I would understand the display,

6    monitor or printer to implement a command generated by the

7    controller.

8              MR. ROBERTS:  Your Honor, that cannot be right

9    according to the claim language.

10             Can I please have slide 38.

11             THE COURT:  I can't have both of you standing?  Who

12   has the floor?

13             MR. ROBERTS:  Since you are going in their direction,

14   if I can speak briefly, your Honor.

15             This is the claim.  It calls for a device for

16   outputting images.  If that device is the printer, then the

17   means for outputting cannot be the printer, because the means

18   for --

19             THE COURT:  I just said that.  I said it's a

20   controller.  I said that the printer or the display is reactive

21   to the information generated by the controller, so the device

22   is the controller.  That's what you're suggestion.

23             MR. ROBERTS:  That's correct.  But the means for

24   generating cannot be that controller.  The generating means are

25   the other boxes to the right.

E357INT1

1          THE COURT:  Well, they pass through the controller,

2     and the controller --

3          MR. ROBERTS:  Correct.

4          THE COURT:  So that's why you are using the word

5     outputting.  So, it's my mistake, and I created a confusion by

6     using the word generating.  "Outputting the images represented

7     by the access data or outputting the output signal represented

8     by the access data," that's the definition that's been agreed

9     to.  I accept it.  And the structure is the controller.

10          MR. ROBERTS:  Thank you, your Honor.

11          MR. ALBERTI:  Your Honor, can we be heard just really

12     briefly on that?

13          THE COURT:  Yes.

14          MR. ALBERTI:  With respect to images --

15          If we can take a look at our slide number 28.

16          In this passage -- and we are talking about column 26,

17     starting around line 30 -- it talks about what actually is

18     output with respect to images.  And again when we are talking

19     about the output of images we are talking about output -- for

20     example, output might contain a header/footer on each page

21     indicating the identity of the authorized user.  A watermark

22     might be printed in the background, or other identifying

23     material might be placed on each image.

24          So, it's talking in this context when you output an

25     image under this patent the actual thing that's doing this

E357INT1

1    outputting function and controlling how that output happens is

2    in fact the display, or the printer, at least in this example.

3              So, while it may be true that the IO controller

4    outputs some signals, we don't dispute that.  At least --

5              THE COURT:  I can understand that without a display or

6    some other form of register or printer that displays that which

7    has been output, the structure is incomplete.  So, the

8    structure could be not only the controller but the display,

9    monitor or printer as well.  I can adopt both.

10             MR. ALBERTI:  We wouldn't have an objection to

11   adopting both, your Honor.

12             THE COURT:  So, should I say an input/output

13   controller and associated display monitor or printer?

14             MR. ALBERTI:  That's fine with us.

15             MR. ROBERTS:  We can accept that.

16             THE COURT:  We are on number 5.  It would be the same

17   thing, wouldn't it, folks?

18             MR. ROBERTS:  No.

19             THE COURT:  The same structure?

20             MR. ROBERTS:  No, it would not, your Honor.

21             So, first of all, the claims call for these things as

22   two different limitations.  There is two different claims.  One

23   has means for generating; one has means for outputting.  It

24   uses different words.  They should be different things.

25             THE COURT:  So, what is the generator?

E357INT1

1          MR. ROBERTS:  The problem is that it doesn't tell you.

2     If you look at figure 35, or slide 35, it could be the thing

3     that generates the signal that passes out through the IO

4     mechanism could be the processing unit; it could be the

5     nonvolatile memory or the encryption hardware.  It could be a

6     variety of things that generate the signal that then pass out

7     via the IO controller.  And it simply doesn't say which one of

8     those structures it is.

9          THE COURT:  It could be all of it, couldn't it?

10          MR. ROBERTS:  It could be all of them, that's

11     absolutely right.  So our point about the lack corresponding

12     structure is that they haven't specified which one of these

13     boxes performs --

14          THE COURT:  But it's implied, I think.

15          MR. ROBERTS:  I think it's implied that it's

16     something, and the question is have they specifically called

17     out a structure as performing the function.

18          THE COURT:  Well, on this diagram there is a single

19     line that passes into the box number 165.

20          MR. ROBERTS:  That's right.

21          THE COURT:  Can I just have a minute?  And that line

22     shows leads from every one of the boxes on the right-hand side,

23     from which I would infer that the functions identified by each

24     and all the boxes, together with the controller, is the

25     generating impulse.

E357INT1

1            MR. ROBERTS:  The problem with that, your Honor --

2            THE COURT:  Let me see first if I got it right

3    according to Intellectual Ventures.

4            MR. ALBERTI:  Your Honor, for this term we really

5    believe -- and if you take a look --

6            THE COURT:  Just tell me if my concept is correct.

7            MR. ALBERTI:  It should be limited to the IO

8    controller.

9            THE COURT:  No, I don't believe so, because a

10   controller or a freostat is a governing body that limits

11   impulses coming into it in some fashion.  So that which is

12   generated is not the controller; it's the origination of the

13   impulse together with the controller.

14           MR. ALBERTI:  So if your Honor would restate what your

15   proposed structure was.

16           THE COURT:  It's all the devices on the right-hand

17   side, right of box 165, everything that goes through 165.

18           MR. ALBERTI:  I'd say with the exception of the disk

19   and the display, which I don't think have anything to do --

20   they're not generating the signals.  I think I'm fine with

21   that.

22           THE COURT:  The display and the disk and the printer

23   are all to the left of box 165.

24           MR. ALBERTI:  There is one display, 164, which is in

25   the box 114, and I would suggest that the display is not

E357INT1

1    creating or generating the signal itself.

2            THE COURT:  I don't know what function it has, nor do

3    I know what function the disk has, except to bring in

4    information from somewhere else, assuming the box for the

5    display is incomplete.

6            I can't tell you that I am familiar with the function

7    in each of these boxes that feeds into the controller.

8            MR. ALBERTI:  At a minimum, your Honor, we would agree

9    that the processing unit and the memory would certainly be

10   devices that are used in any typical computer system to

11   generate signals which would subsequently be outputs by the IO

12   controller.  If your Honor would like to include those

13   elements, we certainly would not object to that.

14           THE COURT:  Well, you have agreed on the function, so

15   I should accept it.  And as to the structure, I can't agree

16   with either of you, because it's not the controller, and there

17   is a corresponding structure, but it's not defined.

18           MR. ALBERTI:  And, your Honor, again, I think you're

19   right, if you want to include some of these boxes, at least the

20   processing unit, and the volatile memory, and together with the

21   IO controller, we would be fine with that.

22           MR. ROBERTS:  May I respond, your Honor, briefly?

23           THE COURT:  Just a minute.

24           How about this:  One or more devices inputting signals

25   into the IO controller and the IO controller.

E357INT1

1                MR. ROBERTS:  Fine with us.

2                MR. ALBERTI:  We're fine with that, your Honor.

3                THE COURT:  I'm getting to understand this.

4           And there are next nine agreements on terms, which I

5      adopt.  I'm sorry, there are 13.

6                Sorry.  Going to number 9 of the agreement and the

7      structure.  Should it be "a display monitor" rather than just

8      "a display"?

9                MR. ALBERTI:  If you want to include "monitor," we're

10     fine with that, your Honor.

11               THE COURT:  Because display is a verb.  We need a

12     noun.  A display monitor.

13               Number 10.  I think "permissions" is better than

14     "rights".

15               MR. ROBERTS:  That's fine with us, your Honor.

16               THE COURT:  Number 11?

17               MR. ALBERTI:  Your Honor, could we be heard on that

18     one?

19               THE COURT:  On 10?

20               MR. ALBERTI:  Yes.

21               THE COURT:  You like rights better?

22               MR. ALBERTI:  I like rights better.

23               THE COURT:  It's going to be permissions.

24               MR. ALBERTI:  That's fine.

25               THE COURT:  Rights have a more mysterious connotation

E357INT1

1    to a jury.  They understand permission.  When they start with

2    rights, they think about law, and I don't think that's what we

3    want to suggest.

4            Similarly, in 11 I will take "permissions" over

5    "rules".

6            MR. ALBERTI:  Well, your Honor, specifically with

7    respect to this one, because we used "rules" in the earlier

8    construction --

9            THE COURT:  Then you're right, then it should be

10   "rules".

11           MR. ALBERTI:  Yes.

12           THE COURT:  And 12, I prefer the grammar "unencrypted

13   form of the protected portions of the data".

14           Well, that completes us through 11.  Now we are ready

15   for the 574 patent.

16           MR. NAGY:  If I can be heard briefly on that.

17           THE COURT:  Which?

18           MR. NAGY:  On the 574.

19           THE COURT:  I was going to suggest a break.

20           MR. NAGY:  Yes, your Honor.  And in fact  --

21           THE COURT:  So, you will be heard after the break.

22           MR. NAGY:  Oh, of course, your Honor.  Sure.

23           (Recess)

24           THE COURT:  OK, Mr. Nagy was going to tell us

25   something on the 574 patent.

E357INT1

1          MR. NAGY:  Actually, your Honor, we resolved it.

2          THE COURT:  All right.  Let me tell you how I was

3     going to describe the patent.

4          "The patent covers a method of using trusted entities

5     to ensure that public or private keys are reliable and have not

6     been faked.  Public or private key encryption (which is covered

7     by a separate patent) is used to encrypt data.  A public key

8     matches a private key, and something encrypted by a public key

9     can be decrypted only by the private key and vice versa.  This

10     patent makes sure that keys aren't faked by using a trusted

11     entity, which holds keys and issues certificates, to vouch for

12     keys.

13          "To transfer information from A to B:  Computer A

14     which has private key A, sends a message to trusted entity; the

15     trusted entity then issues a certificate; the certificate is

16     encrypted with the trusted entity's private key; computers A

17     and B can verify the certificate using the trusted entity's

18     public key.  With the certificate, the trusted entity gives

19     computer A, computer B's public key.  Computer B can then

20     decrypt the data using its private key and verify that the

21     information comes from a trusted source by checking the

22     certificate.  If computers A and B trust different entities,

23     then trusted entities can form a chain of verification, as long

24     as there is a common point of trust."

25          Having read what I wrote, I find it dense, and it will

E357INT1

1    need more work to explain this to the jury.  I think it's

2    sufficient for our purposes here, but it needs more work to

3    explain it to the jury, and that doesn't need to be today's

4    session.

5              All right.  So, we have --

6              MR. ROBERTS:  Your Honor --

7              THE COURT:  -- 17 terms in dispute.

8              MR. ROBERTS:  If you wanted to distribute that to

9    opposing counsel and myself, we would be very happy to try to

10   work on it together to see if we can provide you with some

11   unified comments on it.

12             THE COURT:  I accept that offer.  Thank you.

13             I will just use that as a very brief point of comment.

14   It's my very strong view that jurors are up to understanding

15   the most complicated points of litigation including patents,

16   and that the problems that we all face are due to inadequacies

17   of lawyers, not to inadequacies of jurors.

18             It's the job of a lawyer to explain things in a way

19   that a layman can understand.  I don't include the present

20   group of lawyers in that generalized description.  But it's my

21   experience that whenever juries don't understand, whenever

22   judges don't understand, it's because the burden of explanation

23   has not been satisfied.

24             So, as the person who instructs the jury, it is my job

25   to have instructions that can be clearly understood and

E357INT1

1    applied, and I would be grateful for your help in doing that.

2              All right.  Did you want to say something more,

3    Mr. Nagy?

4              MR. NAGY:  No, your Honor.

5              THE COURT:  The first term in dispute is certification

6    infrastructure.

7              Intellectual Ventures says it's not required to

8    explain this.

9              JP Morgan suggests the following:  "A set of processes

10   for performing certification.  I think that's a good

11   interpretation, neutral and clear.

12             MR. ZOLOTOREV:  Your Honor, may we be heard on that?

13             THE COURT:  Of course.

14             MR. ZOLOTOREV:  This is Jake Zolotorev.

15             If we can go to slide 11 in our presentation.

16             Your Honor, I'd like to make two points with respect

17   to this claim term and JP Morgan's proposed construction of it.

18   The first is that it takes what is clear and plain claim

19   language that we can see on the left-hand side and makes it

20   confusing instead of explaining it.

21             THE COURT:  "Certification infrastructure" is too

22   dense a term, but I think you're making a good suggestion by

23   looking at the larger term, and I think I would say "arranged

24   in a set of processes by which verification is performed" -- or

25   "verification is achieved".  So, I would define it as a set of

E357INT1

1    processes by which verification is achieved.

2               MR. ZOLOTOREV:  Your Honor, if I may address that.

3               THE COURT:  Go ahead.

4               MR. ZOLOTOREV:  The problem that we see here is

5    limiting the term infrastructure, which has a plain meaning

6    that is not limited to just processes.  Of course, when we

7    think about infrastructure we think about hardware, software.

8    If it's transportation infrastructure, it's not just an act of

9    driving, it's also the roads and the cars, etc., etc.

10              THE COURT:  So, would you like "a set of processes and

11   associated devices"?

12              MR. ZOLOTOREV:  I think that would be a fairer

13   characterization of what infrastructure is.

14              MR. ROBERTS:  Your Honor, they are very clear that it

15   is not directed to a set of hardware but is instead a set of

16   processes.

17              If I could have slide 6, please.

18              THE COURT:  Leave that first slide up for a moment,

19   please.

20              System can comprehend both.

21              MR. ROBERTS:  Yes.  But, your Honor, it says, "in a

22   certification system for secure communications containing

23   computer processes arranged in an infrastructure".  It says

24   right there that what we are talking about is a set of

25   processes arranged in an infrastructure.

E357INT1

1              THE COURT:  That was a redundancy, so let's work on

2        that.  "In a certification system for secure communications

3        containing processes and devices by which verification is

4        achieved".

5              MR. ROBERTS:  Your Honor, again the devices on which

6        these processes run are not a key component of what is claimed.

7                    Indeed, if we could have slide 8, please.

8              THE COURT:  I don't know what's key and what's not key

9        at this point.  I'm intent on having these patent claims

10       understood by me and by the jury and have a common language for

11       both of us.  I'm looking for inclusive language.  I'm not

12       looking to give any side an advantage by this process.

13             MR. ROBERTS:  Yes.  And, your Honor, they are the ones

14       who are trying to read in hardware where it is very clear that

15       what is claimed is independent of the hardware.

16                    This is from the specification.  It's talking about a

17       set of functions, and those functions will act independently of

18       the type of hardware platform used.

19                    If I could have slide 6, please.

20                    Slide 6 talks about a set of processes which

21       collectively form the certification system, functions, and

22       infrastructure of the invention.  The invention is directed to

23       a set of processes that are independent of any particular

24       hardware on which they may rely.

25             THE COURT:  Infrastructure can comprehend hardware as

E357INT1

1    well as software.

2              MR. ROBERTS:  Infrastructure can.  In this case they

3    have said we are claiming a set of infrastructure composed of

4    software processes.

5              THE COURT:  I don't go along with you.  There has to

6    be devices in this.

7              MR. ROBERTS:  Yes.  But the question is are those

8    pieces of hardware part of the certification infrastructure, or

9    are they simply the devices upon which that infrastructure is

10   operated?

11             Software doesn't do anything without hardware, so

12   saying that it's a set of software processes doesn't exclude or

13   weed out the existence of hardware.

14             THE COURT:  I think it does, so I'm going to one way

15   or another get devices in here.

16             I'm asked to define certification infrastructure, and

17   it will be defined as follows:  "A set of processes and

18   associated devices by which verification is achieved".

19             MR. ZOLOTOREV:  That is fine, your Honor.

20             MR. ROBERTS:  Your Honor, the other problem with that

21   is by which there is verification, which is certification

22   includes more than merely verification.  So, for example, claim

23   18 which is asserted here --

24             THE COURT:  I think you're right.

25             MR. ROBERTS:  -- talks about registration.

E357INT1

1          THE COURT:  So should we say "by which certification

2     is achieved"?

3          MR. ROBERTS:  Yes.

4          THE COURT:  I think Intellectual Ventures can go along

5     with that, too.

6          MR. ZOLOTOREV:  That is acceptable to us, your Honor.

7          THE COURT:  Next claim is public key.

8          Intellectual Ventures feels that the words are self

9     descriptive.  I disagree.

10         JP Morgan suggests:  "A key that can be used to

11    encrypt data, or to decrypt data that has been encrypted by a

12    corresponding private key".

13         I will accept that.

14         MR. ZOLOTOREV:  Your Honor, may we be heard?

15         THE COURT:  Yes.

16         MR. ZOLOTOREV:  I think after the briefing JP Morgan

17    suggested an alternative construction to what is here -- and

18    they can correct me if I got this wrong -- but it replaces the

19    "or" with an "and".  So, instead of reading "a key that can be

20    used to encrypt data or decrypt data," it's "a key that can be

21    used to encrypt data and ..."

22         THE COURT:  I will accept that.

23         MR. ZOLOTOREV:  And we will accept it with an "and,"

24    your Honor.

25         THE COURT:  Is there only one comma?  The key that can

E357INT1

| | |
|---|---|
| 1 | be used to encrypt data, comma?  So everything else in that |
| 2 | definition qualifies decrypt data? |
| 3 | MR. ROBERTS:  Yes. |
| 4 | THE COURT:  Right, Mr. Zolotorev? |
| 5 | MR. ZOLOTOREV:  Yes, in this construction, yes, your |
| 6 | Honor. |
| 7 | THE COURT:  OK.  Number 3.  Public key certificate. |
| 8 | JP Morgan suggests:  "A data structure binding a |
| 9 | user's identity to a public key". |
| 10 | I would suggest the following:  "Information vouching |
| 11 | for the trustworthiness of a public key, including by |
| 12 | indicating that the public key was issued by the person who |
| 13 | claims to have issued it". |
| 14 | MR. ROBERTS:  Can you read that again, your Honor? |
| 15 | THE COURT:  "Information vouching for the |
| 16 | trustworthiness of a public key, including by indicating that |
| 17 | the public key was issued by the person who claims to have |
| 18 | issued it". |
| 19 | I need to take a few minutes.  Sit in your places. |
| 20 | MR. ROBERTS:  There are two small comments. |
| 21 | THE COURT:  Mr. Roberts, I need to take a couple |
| 22 | minutes. |
| 23 | MR. ROBERTS:  I apologize. |
| 24 | (Recess) |
| 25 | THE COURT:  We were up to claim 4?  Mr. Roberts. |

E357INT1

1            MR. ROBERTS:  Your Honor had proposed:  "Information

2     vouching for a public key including by indicating" --

3            THE COURT:  For the trustworthiness of a public key.

4            MR. ROBERTS:  "Vouching for the trustworthiness" --

5            THE COURT:  -- "of a public key, including by

6     indicating that the public key was issued by the person who

7     claims to have issued it".

8            MR. ROBERTS:  So, your Honor, I have only two comments

9     on that.  The first is that it can be issued not merely by a

10    person but by a computer process.

11           So, for example, you might have a computer process

12    that is issuing the key rather than a person.  And I think,

13    therefore, it should say "was issued by the person or process

14    who claims to have issued it".  So, for example, a website

15    might issue a public key.  It need not be issued by a person.

16           And the other --

17           THE COURT:  Why don't we say "by indicating that the

18    public key was issued" --

19           MR. ROBERTS:  -- "by the entity"?

20           THE COURT:  -- "by the appropriate issuer".

21           MR. ROBERTS:  Very good.  Or you could just say "by

22    the purported issuer".

23           And the other comment I had was --

24           THE COURT:  I would rather use "appropriate" because

25    the jury might think "purported" is sinister.

E357INT1

1          MR. ROBERTS:  OK.  And the other one you said is

2     "information".  I don't have an objection to "information," but

3     it does seem to me that it might be better to say "a data

4     structure," because the information is somewhat -- if it's

5     something in a book, that's not a certificate.  A certificate

6     is in fact an embodiment of that information in a form that can

7     be sent and received.

8          THE COURT:  How about "a certificate vouching for the

9     trustworthiness"?

10         MR. ZOLOTOREV:  Your Honor, we would agree with that.

11         MR. ROBERTS:  The problem with certificate, just

12    repeating the word, is it doesn't give the jury any context for

13    what it is.

14         THE COURT:  It does so.

15         MR. ROBERTS:  OK.

16         THE COURT:  I think they all know what a certificate

17    is.  The question is what kind of certificate is it.  What is a

18    public key certificate?  A public key certificate is a

19    certificate that vouches for the trustworthiness, etc.

20         MR. ZOLOTOREV:  Your Honor, may we be heard?

21         THE COURT:  Yes.

22         MR. ZOLOTOREV:  We agree with leaving in the

23    certificate as part of the construction.  It's really the

24    latter part of the construction that we think may need a little

25    fine tuning.  If we can go to slide --

E357INT1

1          THE COURT:  Let me do this.  I understand your point,

2     Mr. Zolotorev.  "By indicating that the public key was issued

3     by the issuer who was supposed to have issued it".

4          MR. ZOLOTOREV:  I think that would be agreeable to us,

5     your Honor.

6          THE COURT:  I will read the whole thing.  "A

7     certificate that vouches for the trustworthiness of a public

8     key, including by indicating that the public key was issued by

9     the issuer who was supposed to have issued it".

10          Now, I want to know, gentlemen, why can't we stop at

11     public key?  "A certificate that vouches for the

12     trustworthiness of a public key"?

13          MR. ROBERTS:  Because, your Honor, you have to know

14     who issued it.  It's not merely that the key itself is a

15     genuine public key but that it belongs to you.  Because it is

16     the quality of being the public key that corresponds to your

17     private key uniquely that allows us to verify the authenticity

18     of the message.

19          THE COURT:  All right.  "A certificate that vouches

20     for the trustworthiness of a public key and the issuer who was

21     supposed to have issued that public key".

22          MR. ZOLOTOREV:  Your Honor, I think again in the

23     interest of fine tuning the construction, the certificate is

24     not really vouching for the trustworthiness of the entity that

25     issued it; it's just vouching for the fact that the entity did

E357INT1

1    in fact issue the key.

2            THE COURT:  All right, we'll leave it the way it was.

3    Thank you, folks.

4            Number 4.  Data items required for a public key

5    certificate.

6            I think the term needs some definition.

7            JP Morgan suggests:  "A public key and the user's

8    identity".

9            What claim number is this?

10           MR. ZOLOTOREV:  Your Honor, this is for claim number

11   18.

12           THE COURT:  Claim number 18.

13           MR. ROBERTS:  Can you put up slide 19, which has the

14   claim for the court.

15           MR. NAGY:  It's now on the screen, your Honor.

16           THE COURT:  The problem is not the definitions of each

17   term but the whole, which is repetitive and solipsistic,

18   meaning it's turning on itself.  So it reads "requesting a

19   computer process".  That means that somebody is asking for a

20   verification.  "Generating a data structure," which really

21   means responding.  "In a response that" --

22           MR. ROBERTS:  Your Honor, perhaps it would be helpful

23   just in explaining the structure of claim 18.  What claim 18 is

24   calling for -- I think opposing counsel would agree with me --

25   is that this is the process by which certificates are issued,

E357INT1

1   not the process by which certificates are used for

2   verification.

3           THE COURT:  I understand that.

4           MR. ROBERTS:  So, what we are talking about here in

5   step A is the computer that is requesting a certificate --

6   meaning I'm requesting a new certificate for myself -- it fills

7   out an application, and the data items required for a public

8   key certificate are the items that are required for the issuing

9   computer to issue a certificate, a new certificate or a

10  replacement certificate.  So, that's the context in which this

11  is coming up.

12          THE COURT:  You know, the introductory paragraph is

13  clear, but A and B defy understanding.  And we are not helping

14  the process by breaking it down into its components; we are

15  only making it worse.

16          I don't think there is controversy here.  I would ask

17  both of you to see if you can reword A and B so an ordinary

18  person can understand it.

19          MR. ROBERTS:  Would you like us to try to do that now,

20  or do it offline and come back to you?

21          THE COURT:  How about doing it at lunchtime?

22          MR. ROBERTS:  Thank you.

23          THE COURT:  And do the term as a whole; don't break it

24  down.

25          Subparagraph B says before you issue the certificate

E357INT1

1     you need to verify who is asking for it.  It doesn't tell you

2     how to do that, does it?

3              MR. ROBERTS:  No, your Honor, it doesn't say how to do

4     it.  All we're saying is that what you are doing is you are

5     verifying who it's from, and that is necessary because the

6     purpose of the certificate is to, as we've said, bind the user

7     to a particular public key.

8              THE COURT:  That's right.  But, Mr. Zolotorev, is it

9     part of the patent to find out the authenticity of who is

10     asking?

11             MR. ZOLOTOREV:  Your Honor, if I may --

12             THE COURT:  Yes, you may.  I'm asking you.  You must.

13             MR. ZOLOTOREV:  The claim talks about verifying the

14     authenticity of said request.  The claim is not specific to

15     verifying the identity of who the request is from, which is

16     part of the reason that we were objecting to the original

17     construction that was being proposed by JP Morgan.

18             THE COURT:  Well, part of authenticity is identity.

19             MR. ZOLOTOREV:  It certainly is part of it, but

20     authenticity is broader than that.  And if we look at the

21     specification of the patent, when it talks about what it means

22     to be authentic --

23             THE COURT:  It's two things.  It's identity and

24     authorization.  You need to know who is asking.

25             MR. ZOLOTOREV:  But, your Honor, even more

E357INT1

fundamental, your Honor, you need to know that the message

hasn't been tampered with.  Authentic means untampered.  You

also may want to know who is asking, but you need to know that

there has been no tampering.

         If you read the specification, that's where the

specification begins and says we deal with the fact that

messages and keys themselves can be tampered with.

                    (Continued on next page)

E35MINT2

1        MR. ROBERTS:  If it's been tampered with, it isn't

2    from the person it purports to be from.

3        THE COURT:  It can be.  You could have an proper

4    identity of source, but corruption on delay.  Let's say, for

5    example, an authorized request or requests, but the silent

6    partner doesn't know.

7        MR. ROBERTS:  If we could put up slide 25.  That is

8    the graphic that the vendors used to describe the process and

9    the verifying the authenticity comes in box 910.  And then

10   after you've authenticated.

11       THE COURT:  Let me find box 910.  That's a function.

12   It doesn't describe what you do.  As I asked Mr. Zolotorev

13   before, is the authentication procedure part of the patent.

14       MR. ZOLOTOREV:  If we could put up claim 18.

15       THE COURT:  The answer first is yes or no.

16       MR. ZOLOTOREV:  Your Honor, I just want to be clear

17   that we are talking about that the different claims talk about

18   different aspects of the process.  So I would like us to be

19   focused on the invention upon a claim-by-claim basis as opposed

20   to me trying to make broad statements that could cover claims

21   and embodiments that are not at issue.  Here, in claim 18, the

22   invention is -- part of step B, without a doubt, is verifying

23   the authenticity of said request.  Now, can that involve

24   verifying who it's from?  Sure.

25       As your Honor has just spoken about, there is even a

E35MINT2

1    more fundamental aspect of what verifying authenticity is, and

2    that is just making sure that in this case the request, the

3    request for the certificate, which is what we are talking about

4    in A, in B we are now going to verify the authenticity of that

5    request, make sure it's not tampered with.

6          THE COURT:  Mr. Zolotorev, I've learned something.

7    I've learned that when you ask a question that can be answered

8    yes or no and the respondent answers neither yes or no, but

9    starts to give me an explanation, I get to wonder if there is a

10   yes or no answer.  And if there is no yes or no answer, I get

11   to wonder if there is an obfuscation here that hides the fact

12   that there is no claim.

13         MR. ZOLOTOREV:  Your Honor, I believe there is a clear

14   answer and that is the language of the claim.

15         THE COURT:  The answer is yes or no.

16         MR. ZOLOTOREV:  Verifying identity is not a necessary

17   step to claim 18.  Verifying authenticity is.

18         THE COURT:  It's not part of the patent.  It's not

19   part of the claim.

20         MR. ZOLOTOREV:  It is included in the claim, but

21   that's not all --

22         THE COURT:  You verified, but it doesn't tell you how

23   to verify.  We talked about an anomaly before, but we don't

24   have it here.  With respect to verify, an anomaly detects that

25   some strange element has come in that you can't identify and

E35MINT2

1    would raise question which may go to the authenticity of the

2    impulse.  But here there is nothing.  Got it.

3            MR. ROBERTS:  Your Honor, if they are concerned about

4    tampering --

5            THE COURT:  This is the very issue of Nautilus and

6    Biogen, the case on which I was reversed and which the Supreme

7    Court granted certiorari.  That invention dealt with the

8    spacing.  You are probably familiar with the case more than I

9    am now.  Nautilus claimed an invention in the spacing of

10   sensors in gym equipment.  You go on a bike, for example, or a

11   treadmill and you want to know if your heartbeat has gone to

12   the appropriate level and not beyond.  So you need a sensor.

13   And the sensors are in the handlebars.  They could be someplace

14   else, but typically in the handlebars.  But there is also a lot

15   of noise that's created by the motions of muscles and

16   contractions and expansion of muscles.  So the trick is to

17   distinguish between the noise and the heartbeat.  And Nautilus

18   claimed to have done that by the way the sensors for the

19   heartbeat were spaced.  But they didn't describe what the

20   spacing was.

21           And I held that the patent was void for in

22   definiteness.  The Court of Appeals reversed.  It held that

23   trial and error -- I'm simplifying -- that trial and error by

24   someone skilled in the trade would have told them what the

25   spacing was or could be, and it was remanded back to me.  And

E35MINT2

1   before any proceedings could follow from that, the Supreme

2   Court granted a writ of certiorari.  There are other issues

3   described in the petition for cert., but basically, I think

4   that is a key here.

5         Here we have a situation where we are talking about

6   verification, but it's not described how the verification takes

7   place.  If I act consistently with the way I see things under

8   Section 112 in the Nautilus and Biogen case, I probably would

9   be concerned about this issue of validity.  That's beyond the

10  Markman.  In the Markman my purpose is to define and define in

11  a neutral way so as to not advantage either side, but to be

12  accurate to the claims themselves.  But here there is no

13  specification, it seems to me, how verification should be

14  accomplished.

15        MR. ZOLOTOREV:  Your Honor, if I may be heard very

16  briefly on this point, there is a reason.

17        THE COURT:  For purposes of my saying this is just to

18  excite those comments.  You don't have to apologize for rising.

19  I want you to.

20        MR. ZOLOTOREV:  There is a reason why JPMC hasn't

21  brought an indefiniteness issue to these terms.

22        THE COURT:  Say that again.

23        MR. ZOLOTOREV:  There is a reason, your Honor, why JP

24  Morgan Chase has not brought an indefiniteness challenge to any

25  of these terms.

E35MINT2

1          THE COURT:  It's not time for it.  They are waiting

2     for this proceeding.

3          MR. ZOLOTOREV:  There is another reason for it.  The

4     specification is very clear and provides embodiments and

5     specific details about what a sample certificate could be, how

6     one would go about verifying the authenticity.  That is all

7     presented in the specification at a very, very low level of

8     detail, sometimes down to the actual commands, computer

9     commands.

10          THE COURT:  You mean high level of detail.

11          MR. ZOLOTOREV:  Both high and low.  We go from concept

12     to actual algorithms.  That is all in the specification.  If I

13     can put up figure 3 of the patent, if that's possible.

14          Your Honor, figure 3, which you have on your screen

15     now, is an example of what a certificate could look like.  And

16     it has various fields that are all described in the

17     specification.  And if we go back to claim 18, remember, claim

18     18 talks about asking for a certificate, and generating to ask

19     for a certificate you basically fill out an application and the

20     term that we are actually trying to construe, your Honor, is

21     data items required for a public key certificate.  And the

22     claim itself tells us that the one thing you got to have, you

23     need to have in that application is the public key that you are

24     going to be certifying and that is certainly one of the fields

25     in this embodiment.  But here we can see why the patent

E35MINT2

1        talks --

2                    THE COURT:  Configured by a certain algorithm.

3                    MR. ZOLOTOREV:  Correct.

4                    THE COURT:  Which your system will recognize.

5                    MR. ZOLOTOREV:  Which the system will recognize and

6        read the fields.

7                    THE COURT:  By signature you don't necessarily mean a

8        manual signature.  You need a certain algorithm.

9                    MR. ZOLOTOREV:  The patent describes that the process

10       of a signature would typically involve in description so this

11       is an automated process, obviously.  A person wouldn't be able

12       to accomplish it.

13                   THE COURT:  My question to both of you is whether this

14       information should be incorporated in the definition of the

15       claim.

16                   MR. ZOLOTOREV:  We believe, your Honor, the claim

17       itself tells you the minimum needed information.

18                   THE COURT:  I don't think so.  So I ask the question.

19                   MR. ZOLOTOREV:  Your Honor, if your Honor is concerned

20       that just the public key, providing the public key is not

21       enough --

22                   THE COURT:  In every patent description, any

23       advancement of a claim, there is attention to how much to

24       disclose.  The more you disclose, the more the claim is bound

25       up with information, the narrower the claim and that gets in

E35MINT2

1  the way of patent infringement litigation.  The more general

2  the claim, if it serves the function of validity, the more

3  general the potential for a patent infringement litigation.

4          So when I ask this question, how much of the

5  specifications should be incorporated into the definition, I'm

6  very much aware of the significance of my question.  And I will

7  tell you my bias, which is in favor of description.  So I would

8  want to include the specification language in the definition of

9  the claim because I think it's necessary for validity and it's

10  not my job to invalidate patents.  It's my job to understand

11  the patent and to examine its validity in the context of the

12  full understanding and any relationship to prior art.

13          MR. ZOLOTOREV:  Your Honor, if this is your Honor's

14  concern, I have a very specific suggestion for where to look in

15  the specification.

16          THE COURT:  I want you to give me a definition of the

17  claim, not this minute, but I want a better definition of the

18  claim.

19          Mr. Roberts.

20          MR. ROBERTS:  Yes, your Honor.  This is exactly our

21  issue on this patent, which is, they have proposed plain and

22  ordinary meaning on everything and won't give us any

23  constructions.

24          THE COURT:  Maybe they will think differently then.

25  Mr. Roberts, I understand.  You notice that there are very few

E35MINT2

```
 1   instances where I have accepted.  I think you have an
 2   understanding where I'm coming from.
 3              MR. ZOLOTOREV:  Your Honor, in fact, I can propose a
 4   construction that I think addresses --
 5              THE COURT:  Do it at lunchtime.  I want Mr. Roberts to
 6   see it and think about it and put it to me.
 7              MR. ZOLOTOREV:  Very well, your Honor.  Thank you.
 8              THE COURT:  You know what I want.
 9              MR. ZOLOTOREV:  Thank you, your Honor.
10              THE COURT:  That takes us now to what number?
11              MR. ZOLOTOREV:  Your Honor, the chart includes a
12   number 5, which is a certificate.  The parties, in fact, have
13   agreed --
14              THE COURT:  I said before that I am not interested so
15   much in the specific components of these phrases A and B.  I
16   want a definition of the whole, not of the little pieces,
17   because I think I have to charge the whole for the jury and
18   it's not possible, in my opinion, to understand it, so I want a
19   better and clearer statement of A and B.
20              MR. ROBERTS:  Your Honor, we will give you A.
21              THE COURT:  I want you to work together.
22              MR. ROBERTS:  We will work together on it.  I would
23   submit, your Honor, that there are disputes about the meanings
24   of these individual components and ambiguities in them.  For
25   example, when it says items required, are we talking about all
```

E35MINT2

 1   of these items shown in the picture or just some?

 2              THE COURT:  Can you put up the language.

 3              Go ahead, Mr. Roberts.  Show me specifically.

 4              MR. ROBERTS:  Here:  Data items required for a public

 5   key certificate.  What do they claim are those items?  Is it

 6   just going to float and as we go through the case they are

 7   going to say it changes from day to day?  We would like to know

 8   what they are for both validity and infringement.

 9              THE COURT:  I think what Mr. Zolotorev says is that by

10   referring to that bar graph in the previous picture, in figure

11   3, those are the items.

12              MR. ROBERTS:  If they were willing to say that each of

13   those items is required, we would agree and we would move on,

14   but they are not willing to say that.

15              MR. ZOLOTOREV:  Your Honor, figure 3 shows one example

16   of a certificate.  I believe we can work together and there is

17   a place in the specification.

18              THE COURT:  No one wants to tie himself to an

19   exclusion.  By saying only this, he leaves himself open because

20   there may be others.  But I think it's sufficient to give a

21   very good example and this is a very good example.  Figure 3 is

22   a very good example.

23              MR. ROBERTS:  Your Honor, there is a difference

24   between saying what is the minimum, what is required and saying

25   there may be other things in addition.

E35MINT2

1          THE COURT:  I have to work with the Second Circuit

2     tests all the time.  The Second Circuit loves tests.  Seven

3     tests, seven criteria and so on.  But they always say, you

4     don't have to satisfy each one.  You have to satisfy the tests.

5     But you can have some on your side, some on the other side.

6     You do an evaluation.  Maybe that's what's needed.  I don't

7     know.  I have not thought about it because I have not seen it.

8          But I think Mr. Zolotorev has come up with something.

9     Are these all required?  Is there some that's required?  Is

10    there a human agency that makes an evaluation?  If there is an

11    objective criteria, there is an algorithm that has to be

12    disclosed because that's the key.  If it's subjective in some

13    fashion, that has to be disclosed.  But I think Mr. Roberts is

14    entitled to know that.

15         MR. ROBERTS:  Can we put up slide 24, please.

16         Your Honor, the way I suggest and the way we have

17    drawn our construction is to look at what the specification

18    says the purpose of this is.  And it says:  The certificate

19    authority vouches for the identity of the public key owner, for

20    the integrity of the public key itself, for the binding between

21    the public key and the owner's identity.  That's where we get

22    that binding language from.  And, optionally, for some

23    additional capabilities of the certificate owner in the

24    electronic environment.  This guarantee is reflected in the

25    certificate.

E35MINT2

1          THE COURT:  Where did you get this from?

2          MR. ROBERTS:  This is from the specification at column

3    10, line 45 through 52.  And it's the clearest statement that

4    there is.  And we think that the certificate, therefore, at a

5    minimum, what's required is a public key and the user's

6    identity because it is going to vouch for those two things and

7    bind them together.  It must have those two things.  And that's

8    where we came up with our definition, which was the public key

9    and the user's identity.

10          THE COURT:  I think it needs some discussion between

11    you.  I think now you know how my understanding is, my

12    requirements are.  You can look together to see if you can

13    satisfy it.  Of course, you do what you think is important for

14    your own case.  To the extent you can get together on this, it

15    would be useful.

16          MR. ROBERTS:  As an efficiency point, your Honor,

17    since they have proposed plain and ordinary meaning for every

18    single term in this patent, might we suggest that we move on to

19    another patent and give them an opportunity to write down

20    constructions for all --

21          MR. NAGY:  There are 14 more, your Honor.  There are

22    17 in total and all of them are going to present this same

23    issue where IV --

24          THE COURT:  Let me ask this.  Put up the claim again.

25          MR. ROBERTS:  Slide 23, for example.

E35MINT2

```
 1              THE COURT:  This is claim 18, A and B.  Look at your
 2       chart.  Which claim term?  What number claim term reflects 18A
 3       and B?  What number?
 4              MR. ROBERTS:  18A and B are reflected in item number
 5       4; item number 5, although that's agreed; item number 6.
 6              THE COURT:  They are consecutive.
 7              MR. ROBERTS:  Item number 7, although 7 appears --
 8              THE COURT:  Mr. Roberts, they are consecutive.
 9              MR. ROBERTS:  Yes.  I don't have off the top of my
10       brain, your Honor --
11              THE COURT:  I'll tell you.  3 through 7.
12              Mr. Zolotorev.
13              MR. ZOLOTOREV:  I believe that's correct, your Honor.
14              THE COURT:  We are down to 8.  What claim number?
15              MR. ZOLOTOREV:  8.  We agreed upon the construction of
16       8, your Honor.
17              THE COURT:  Why don't you answer my question.
18              MR. ZOLOTOREV:  8 appears in the dependent claim.
19              Just a second to go forward here.  The term is
20       application.  The term is application, your Honor.  It appears
21       in dependent claim 21.
22              THE COURT:  You want to put that up.  I don't
23       understand the term application.
24              MR. ROBERTS:  Your Honor, I believe that we agreed
25       that it's a computer program, and I believe we did that just
```

E35MINT2

1    before the hearing today.  We could argue and present data.  If

2    they still stand by that agreement, then I think we are done.

3              THE COURT:  Expiration of an existing certificate is

4    defined as after the expiration date in the certificate.

5              MR. ROBERTS:  Yes, your Honor.  This is just --

6              THE COURT:  I assume that there is a date in the

7    certificate that caused it to expire at a certain time, or is

8    it a condition that causes expiration?

9              Mr. Zolotorev.

10             MR. ZOLOTOREV:  Your Honor, there is no requirement.

11   That is our problem with the construction.  There is no

12   requirement that there be a date in the certificate, but

13   certainly this is a timing issue.

14             THE COURT:  You agree.

15             MR. ZOLOTOREV:  We agree with JP Morgan Chase that

16   expiration of a certificate refers to a time.  So a time

17   comes --

18             THE COURT:  After the expiration date in the

19   certificate.

20             MR. ZOLOTOREV:  What we disagree with, your Honor, is

21   that the construction offered by JP Morgan Chase referred to an

22   expiration date that has to be somewhere in the certificate

23   itself.

24             THE COURT:  Show me the claim.  The method of claim

25   18, performed upon expiration of an existing certificate, where

E35MINT2

1    the new certificate may contain either the existing or a new

2    public key.

3            It doesn't say date and it doesn't say where.  How do

4    we find out what the expiration is?

5            MR. ZOLOTOREV:  The expiration date may be in the

6    certificate.  It may also be something that's kept --

7            THE COURT:  I repeat my question.  How do we find out

8    when the certificate expires?

9            MR. ZOLOTOREV:  We either consult the certificate, if

10   it has the date on it, or we can consult third-party database

11   software, for example.

12           THE COURT:  I need a definition.  You are not defining

13   it.  You are going to define it with Mr. Roberts.

14           MR. ZOLOTOREV:  Thank you, your Honor.

15           THE COURT:  Number 10.  In common with.

16           MR. ROBERTS:  Your Honor, we did propose a

17   construction.

18           THE COURT:  Please don't boast about how good you are.

19           MR. ROBERTS:  No, your Honor.

20           THE COURT:  He says that the construction that he

21   suggested is not accurate.  He is going to have to come up with

22   something else.

23           10.  In common with.  Let me see the claim.

24           MR. ZOLOTOREV:  Can we put up slide 41, please.

25           THE COURT:  I need the definition of in common with,

E35MINT2

1    unless it's also trusted by.

2              MR. ZOLOTOREV:  I think we would be fine with also

3    trusted by.

4              THE COURT:  Okay.  Adopted.

5              Next, verifying the authenticity of signatures it.

6              MR. ZOLOTOREV:  Slide 44, please.

7              THE COURT:  Can you accept the JP Morgan suggestion?

8              MR. ZOLOTOREV:  I don't believe that we can, your

9    Honor, just because it introduces terms that are not used in

10   the claim.  So it introduces more complexity than the plain

11   language of the claim.

12             THE COURT:  What's the method?  How is the

13   verification to be acknowledged?

14             MR. ZOLOTOREV:  The verification in this method is

15   accomplished it.  Iteratively, meaning one by one.  And that

16   may be what JP Morgan's construction is getting at.  But it's

17   using terminology that is nowhere found in the claim.

18             THE COURT:  It may be in the specifications.  You use

19   a method of verifying.  What is the method?  If there is

20   nothing in the specifications of the patent, that means anybody

21   can figure out any method.  How do you verify the signed data

22   structure.

23             MR. ZOLOTOREV:  The specification.

24             THE COURT:  Same point, Mr. Zolotorev.  We don't need

25   to waste time.  All these things require definition.  If you

E35MINT2

```
 1    want to save your patent, you are going to have to figure out

 2    the specifications.

 3              MR. ZOLOTOREV:  We would be fine, your Honor, with

 4    iteratively as being defined as one by one, which is what the

 5    specification tells you to do.

 6              MR. ROBERTS:  That is absolutely not accurate.

 7              THE COURT:  Mr. Roberts, don't jump up so fast.

 8    Iteratively is not sequentially.  Iteratively connotes a

 9    repetition, a series.

10              MR. ZOLOTOREV:  Correct, your Honor.

11              THE COURT:  What is the iterative quality that is

12    involved?  Doesn't say one by one.  It says there is a process

13    here.  There is an intelligence embodied in a process.  It's

14    got to be described in some fashion.  You got specifications

15    that describe it?

16              MR. ZOLOTOREV:  Yes, your Honor, we do.

17              THE COURT:  Do it.

18              MR. ZOLOTOREV:  We can start with --

19              THE COURT:  This process is not only plain meaning of

20    terms.  It's a process of ordinary and customary meanings as

21    understood by a person of ordinary skill in the art when read

22    in the context of specification and prosecution history.  I

23    quote from Thorner v. Sony Entertainment America, LLC, 699 F.3d

24    1362 at page 1365 (Fed Cir. 2012) and many other cases like

25    that.
```

E35MINT2

1          My job here to make this intelligent, not by a bunch

2     of words, but by a meaningful exercise that is intelligible to

3     a jury.  That's what we are going to do.  That's the purpose of

4     this exercise.  And you can't say interpretation and terms not

5     required.  They are required.  Let's incorporate what they

6     teach from the specifications so that people can understand

7     what the invention is.

8          MR. ROBERTS:  Your Honor, can I show you what the

9     specification says?

10          THE COURT:  No.  That's for Mr. Zolotorev and you to

11     work out together.

12          MR. ZOLOTOREV:  Okay, your Honor.  We will.

13          THE COURT:  It's now almost 12:45.  I have to break

14     for lunch.  I have a different suggestion.  My suggestion is

15     that we break for the day.  You've got a lot of work to do and

16     we have a session tomorrow starting at 11:00.  If you want, I

17     can postpone that, too.  But I think we will work with a great

18     deal more efficiency if you have more time together, now that

19     you understand my attitudes, with your colleagues whether or

20     not you want to address those attitudes.

21          MR. ZOLOTOREV:  Certainly, your Honor.  If I may

22     confer with my colleagues on the timing.

23          THE COURT:  Sure.

24          MR. ZOLOTOREV:  Your Honor, the suggestion from my

25     colleagues would be that perhaps we can address one of the

E35MINT2

1   shorter patents, like the '694 patent, today, where there is

2   only very few terms.

3           THE COURT:  Let's come back at 2:15.

4           Mr. Nagy.

5           MR. NAGY:  Your Honor, one point.  You seem to want

6   constructions where it's now just plain ordinary for all of the

7   remaining terms.  I just want to be sure that's right, so we

8   can come back to you where they have a proposal, we have a

9   proposal --

10          THE COURT:  It's not important for me to repeat.

11          Lunch break.  See you at 2:15.

12          (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

E35MINT2

```
 1                          AFTERNOON SESSION

 2                              2:15 p.m.

 3            MR. ALBERTI:  Your Honor, I would like to excuse my

 4   colleague, Jake Zolotorev, so he can go back and work on those

 5   '574 constructions.  I wanted to make sure we didn't get back

 6   to that patent today before I excuse him, since he is the most

 7   qualified to speak to that.

 8            THE COURT:  I don't plan to.

 9            MR. ZOLOTOREV:  Thank you, your Honor.

10            THE COURT:  What are we going to cover now?

11            MR. NAGY:  Your Honor, the '694 patent, which has two

12   terms in dispute.

13            THE COURT:  This patent covers a method for filtering

14   packets of information, based on the data contained in multiple

15   packets.  A packet of information typically has two components:

16   The header, which contains information about the destination

17   and source, and the payload, which contains the data.

18   Frequently data is spread over several packets.  The patent

19   filters packets based on the data contained in the payload of

20   multiple patents.  Again, I have got to work on this.

21            And there are two items in dispute.

22            The term packet, according to Intellectual Ventures,

23   is defined as a discrete unit of structured information defined

24   by a network communications protocol.  JP Morgan defines it as

25   a discrete unit of information, suggests a discrete unit of
```

E35MINT2

 1    information being routed through a computer network.

 2              MR. NAGY:  Your Honor, we have no problem with that.

 3              THE COURT:  What's Intellectual Ventures' position?

 4              MR. ALBERTI:  Your Honor, there is two issues that we

 5    have with that.  The first is that a packet does, in fact, have

 6    structure according to the '694 patent.  In particular, within

 7    the claim itself it indicates some of that structure, which is

 8    at least a header that includes certain parameters and a

 9    payload.  And one of the parameters would be a parameter

10    identifying protocol.

11              THE COURT:  How would you define it?

12              MR. ALBERTI:  I would define it as a discrete unit of

13    structured information --

14              THE COURT:  Structured because there is no

15    information.  It's just a big word which doesn't mean anything.

16              MR. ALBERTI:  A discrete unit of information routed

17    through a computer network defined by a network protocol.

18              MR. NAGY:  Your Honor, may I respond to that?

19              THE COURT:  Yes.

20              MR. NAGY:  The problem with that, your Honor, is the

21    patent is clear that that additional limitation is not part of

22    what a packet is.

23              THE COURT:  I agree.

24              MR. NAGY:  Thank you, your Honor.

25              THE COURT:  What about adding to a specific

E35MINT2

1   destination or to a designated destination or to a designated

2   addressee?

3           MR. NAGY:  Your Honor, we have got an objection there

4   and the problem with that, this patent is about filtering

5   packets.  One of the types of packets you might want to filter

6   are, for example, malformed packets.  They are going to where

7   they are not supposed to be going and there is no need for a

8   packet to have a specified destination.  The specification

9   actually tells us that.  It says a packet might have a header,

10  but it might not.  It might have a payload.  It might not.  It

11  doesn't have to have a destination and it really goes to the

12  point of the invention in the sense that you might have a

13  malformed packet, exactly what you want to exclude.  We don't

14  need to do more, Judge, than what we've done.

15          MR. ALBERTI:  Your Honor, I would disagree with that.

16          THE COURT:  Adding the word often.  A discrete unit of

17  information being routed through a computer network often to a

18  designated addressee.

19          MR. ALBERTI:  I'm fine with that.

20          MR. NAGY:  Just one second, your Honor.  I want to

21  make sure I have your construction right.

22          THE COURT:  A discrete unit of information being

23  routed through a computer network often to a designated

24  addressee.

25          MR. NAGY:  Can we move often, your Honor, to before

E35MINT2

1   being.  Often being routed through a computer network.

2          The reason we think we ought to qualify it that way, a

3   packet doesn't always have to be routed through a computer

4   network.  It could be within a single computer, it could be at

5   rest and it would still be a packet if it were at rest.  We

6   don't want to suggest that a packet is not a packet unless it's

7   being routed.

8          THE COURT:  The purpose of having it as a packet is to

9   be routed.

10          MR. NAGY:  That's right, your Honor.

11          THE COURT:  Okay.  Done.

12          Second, a combination of the contents of the packet

13   received in step A and the contents of at least one other

14   packet.  JP Morgan doesn't offer anything else.

15          Intellectual Ventures.

16          Let me suggest what I think.  A combination of the

17   contents of the payload of the packet received in step A,

18   identified in step A, and the contents of the payload of at

19   least one other packet.  I'll read it again.

20          A combination of the contents of the payload of the

21   patent identified in step A and the contents of the payload of

22   at least one other packet.

23          MR. ALBERTI:  Intellectual Ventures agrees with that,

24   your Honor.

25          MR. NAGY:  Your Honor, we disagree.

E35MINT2

1          Can I have slide 28, please.

2          Judge, the reason we disagree is, this particular

3    construction, it's the only one of the 38 constructions you

4    have, is not really a construction.  It's a request to correct

5    what IV claims was a mistake made by the examiner.  However,

6    Judge, when you look at history here, the examiner simply did

7    not make this mistake.  And what we are showing you here to try

8    to capture this is just one example.

9          THE COURT:  How would you change the definition?

10          MR. NAGY:  I would change the definition, your Honor,

11    by not altering the claim language in the second part of it.

12    So you should not say in the second step.  The contents of the

13    payload.  It should simply be what it is now.  The contents of

14    other packets.  Intellectual Ventures doesn't contend that

15    contents of the packet actually means contents of the payload.

16    We are in agreement that a packet and a payload are different

17    things.

18          THE COURT:  I think the definition, focusing on

19    payload, is better because it's not the header that's being

20    prepared.

21          MR. NAGY:  Your Honor, if I may, if you look at slide

22    28, this examiner actually rejected as anticipated by prior art

23    the construction that you're about to give.  If you take a look

24    at IV's construction, they say payload, payload.  We say

25    payload --

E35MINT2

1          THE COURT:  Why do you care?  If this is anticipated

2     by prior art, you have a motion.

3          MR. NAGY:  We do have a motion, your Honor.

4          THE COURT:  Why do you care?

5          MR. NAGY:  We care, your Honor, because the

6     construction is wrong and we think there are a number of issues

7     implicated by this.  The examiner looked at a claim.  There

8     were 26 claims originally submitted.  He said claim 26 does

9     exactly what you are saying, payload payload.

10          Go back.  We will show you the claim 26.

11          THE COURT:  What's the difference between contents and

12     payload?

13          MR. NAGY:  Contents is broader, your Honor.

14          THE COURT:  Why?

15          MR. NAGY:  For example, if this is a packet with a

16     header in a payload, it includes the header.  It is not limited

17     to the payload.  There is no ambiguity here, your Honor.

18          THE COURT:  Can you not answer until I ask.  Both of

19     you, keep quiet.

20          In my introduction I have defined a packet typically

21     having two components, the header and a payload.  Does it have

22     other components?

23          MR. NAGY:  It might, your Honor.

24          THE COURT:  For example.

25          MR. NAGY:  For example, it could have something called

E35MINT2

1    a footer or it might have another field, depending on what kind

2    of packet it is.  And the examiner was clear.  You are not

3    being asked to change this.  You are not being asked to define

4    contents of the packet because they actually believe a packet

5    means a payload.  They say the examiner made a mistake.  He

6    could not have made a mistake, your Honor.  He repeatedly

7    addressed this language.  And he found that a claim that was

8    proposed, claim 26, that was payload payload, payload of the

9    packet identified in step A and payload of other packets, he

10   rejected that.

11            And I raise that just to make clear that there wasn't

12   a mistake by this examiner.  Therefore, you ought to not

13   redraft this claim.  That's the issue.  Should you redraft it,

14   we don't think you should, your Honor, because it's clear, he

15   didn't make a mistake.  Might we challenge this as invalid?

16   Sure.  That's not a reason, however, to redraft the claim.

17            THE COURT:  Would you put up on the board the claim.

18            MR. NAGY:  We have the claim in slide 9, please.

19            THE COURT:  I think I would accept the proposition of

20   JP Morgan not to have an interpretation.

21            MR. NAGY:  Thank you, your Honor.

22            MR. ALBERTI:  Your Honor, I would like to be heard on

23   that.  If we take a look at the claim, the language of the

24   claim is right in front of us.  And this was discussed at

25   length in the tutorial and your Honor correctly noted at that

E35MINT2

1    time what this patent deals with is the looking at multiple

2    payloads.  That, in fact, is what distinguishes this patent

3    from the prior art.  And if you go step by step, you'll see

4    that the selecting step, which is step B, recites:  Selecting

5    an access rule based upon the contents of the payload received

6    in step A.

7            And when we take a look at what was added to the

8    implementing step, which is step C, the additional language

9    that was added was the, wherein the access rule is selected

10   based on a combination of the contents of the packet received

11   in step A.  The word the contents refers back to the contents

12   contained here in step B, which is the contents of the payload

13   and the contents of at least one other packet.

14           THE COURT:  It says step A.

15           MR. ALBERTI:  Correct.  But the selecting rule in step

16   B is very clear, that selecting is based on the contents of the

17   payload of the packet.  When you see the contents in this

18   claim, the only time that word is used is to refer to the

19   contents of the packet payload.

20           THE COURT:  You have to have similarity between both

21   parts of the phrase.  These phrases are in apposition.  They

22   are intended to have similar connotations.  So the words used

23   should be the same.  If it says the contents of the packet

24   received in step A, it should say the contents of at least one

25   other packet.  If payload is introduced into the first part,

E35MINT2

1    payload should be introduced into the second part.  If it's

2    not, it should not.  That's my ruling.

3           I go by JP Morgan that an interpretation is not

4    required.

5           MR. NAGY:  Your Honor, as a housekeeping matter, we

6    have two patents left.  You had proposed finishing tomorrow --

7           THE COURT:  Let me finish this one.

8           MR. NAGY:  Apologize.  We are finished.

9           THE COURT:  I have the agreed terms.

10          MR. NAGY:  That's right, your Honor.

11          THE COURT:  What's the reason for the underline in the

12   claim terms selecting an access rule?

13          MR. NAGY:  Your Honor, it's simply to delineate which

14   corresponds to which in the agreed construction.  If it's

15   confusing, your Honor, we just don't need it.  You can omit it

16   in both parts.

17          THE COURT:  I adopt the agreements.

18          So we are not involving ourselves in the '574 patent

19   and the '666 patent.

20          MR. ADAMO:  Your Honor, good afternoon.  We are ready

21   to proceed on '666 right now or if your Honor chooses or it

22   will be easier for the Court, we can come back tomorrow

23   morning.  I don't think it's going --

24          THE COURT:  Let's go ahead.  Let's do as much as we

25   can.

E35MINT2

1         MR. ADAMO:  Very good.  Thank you, sir.

2         THE COURT:  I introduce it as follows:  This patent

3    covers the crypto-engine, a processor which is dedicated to

4    encryption or decryption.  The crypto-engine can use two

5    protocols for encrypting or decrypting data:  RSA, which bases

6    computations on the multiplication of large prime numbers and

7    ECC, which bases computations on an elliptic curve.  Both

8    protocols use modular multiplication.

9         We are going to have to do better on this because

10   these are terms that the jury may not be familiar with.

11        There are three items in dispute.  There are actually

12   seven items in dispute.  First one is multiplication unit.

13        There is a difference because JP Morgan wants to add

14   the word solely, which is not in the claim, so I would like to

15   define it as a unit capable of performing multiplication, which

16   is the suggestion of Intellectual Ventures.

17        MR. ADAMO:  Your Honor, if the Court recalls, when we

18   were here during the tutorial, counsel for IV agreed with using

19   the language and your Honor quoted Mr. Lim's statement.  I'm at

20   record page 114, line 19 to record page 115, line 4 when I

21   said:  In particular, the modular multiplication unit is

22   capable of doing one thing and only one thing.  It can't do

23   anything other than multiply.  Your Honor then said:  I think

24   Mr. Lim said that it's dedicated to multiplication.  I said

25   yes.  And not just dedicated to it, it's incapable of doing

E35MINT2

1    anything else.  And you said:  Same thing.  And similarly --

2              THE COURT:  You would be happy if I say unit dedicated

3    to performing multiplication.

4              MR. ADAMO:  I would, sir.  That would be fine.

5              THE COURT:  Who is responding?

6              MR. LIM:  I am, your Honor.

7              If I may refer your Honor --

8              THE COURT:  Tell me whether you go along with what I

9    said.

10             MR. LIM:  We would like to have a unit capable of

11   performing multiplication.  The units are not dedicated or

12   solely.  Neither of those terms appear in the claim,

13   specification or the prosecution history.

14             THE COURT:  Put up the claim, please.

15             How do you distinguish the multiplication unit from

16   the addition unit?

17             MR. LIM:  By the fact that the multiplication unit is

18   capable of performing multiplication and the addition unit is

19   capable of performing addition, your Honor.  The function that

20   it's capable of performing delineates the three units.

21             THE COURT:  I don't think I need to add solely.  Go

22   with Intellectual Ventures.

23             MR. ADAMO:  Your Honor, during the prosecution of this

24   patent -- could I have slide 8, please -- there was a rejection

25   over the Stujanic reference, I believe is the right way to

E35MINT2

1    pronounce it.

2              THE COURT:  I can end this.  How about defining a unit

3    that performs multiplication?

4              MR. ADAMO:  That definition leaves the term open to,

5    it could also perform addition.

6              THE COURT:  But it's not being defined that way.  And

7    if you want to do it, you can do it.  It's a unit that performs

8    multiplication.  That's the way it's going.  Unit that performs

9    multiplication.  The addition unit is a unit that performs

10   addition.

11             MR. ADAMO:  Same comment for the same reasons, your

12   Honor.  I understand the Court's ruling.

13             THE COURT:  Overruled.

14             Third, sign inversion unit.  What's sign inversion,

15   Mr. Lim?

16             MR. LIM:  Your Honor, it's the same issue.  As you can

17   see --

18             THE COURT:  What is sign inversion?

19             MR. LIM:  Simply inverts a sign of a number, your

20   Honor.

21             THE COURT:  Sign or cosign, you mean.

22             MR. LIM:  Positive number to negative number, negative

23   number to positive number.  Inverting the sign of the number.

24             THE COURT:  How about say a unit that changes positive

25   numbers into negative numbers and negative numbers into

E35MINT2

1    positive numbers?

2              MR. LIM:  We are okay with that.

3              MR. ADAMO:  That's acceptable to JP Morgan Chase.

4              THE COURT:  That's acceptable to Mr. Adamo.

5              Fourth claim in dispute is output.  I don't think it

6    need to be defined.

7              MR. LIM:  Agreed, your Honor.

8              MR. ADAMO:  Your Honor, are you just not going to then

9    instruct the jury as to any meaning of the word output?

10             THE COURT:  I have to instruct the jury as to the

11   whole claim, right?

12             MR. ADAMO:  Yes.

13             THE COURT:  That's a word in the claim.  They know

14   what output is.

15             MR. ADAMO:  Understood.

16             THE COURT:  It's the antonym of input.

17             MR. ADAMO:  Your Honor, just for a moment can I have

18   slide 5, please.

19             Your Honor, the reason that we think a definition of

20   output would be important in the context of figure 2 of the

21   patent, which is shown on this slide 5, would be to make it

22   clear that the lines that say temp data that your Honor can

23   see, that's what the output is that the claim is talking about

24   that speaks -- look at either claim 1 or claim 4.  It talks

25   about the outputs of the multiplication unit, of the addition

E35MINT2

1   unit, and the sign inversion unit.  So the outputs are the temp

2   data items that are shown coming out of the modular

3   multiplication unit 15.

4            THE COURT:  It's either an output or an input if it's

5   moving.  We don't need it.

6            MR. ADAMO:  Understood, your Honor.

7            THE COURT:  Next one is feedback.  I don't think we

8   need anything here.

9            MR. LIM:  Agreed, your Honor.

10           MR. ADAMO:  Your Honor is just, again, going to read

11   the claim with the term feedback.

12           THE COURT:  Correct.

13           MR. ADAMO:  In context, sir.

14           THE COURT:  Correct.

15           MR. ADAMO:  Understood.

16           THE COURT:  Next is host processor.  What is the

17   claim?

18           Mr. Lim, in your own words, what do you mean by host

19   processor?

20           MR. LIM:  Your Honor, host processor, the spec

21   provided that plain ordinary meaning of what a host processor

22   is.

23           Can I have slide --

24           THE COURT:  Can you just talk to me.

25           MR. LIM:  I'm sorry.

E35MINT2

1    THE COURT:  Person to person.  I'm on the street.  We

2  are having drinks.

3    MR. LIM:  A host processor --

4    THE COURT:  I heard this term host processor.  What

5  does host processor mean?

6    MR. LIM:  The central processor that is running this

7  main computer.

8    THE COURT:  Why can't we say that?

9    MR. LIM:  I'm sorry.  Maybe I'm a little nervous.

10  Yes, that's what it is.

11    THE COURT:  Mr. Adamo, how do you define the host

12  processor?  We are having drinks.  I ask you a question.  I use

13  the phrase host processor.  What do you mean?

14    MR. ADAMO:  Host processor is the processor that runs

15  the computer at a slower speed than the processor that's

16  located in the crypto-engine.

17    THE COURT:  I don't know what you're talking about.

18    MR. ADAMO:  Slower.  It goes 10 miles an hour, your

19  Honor, while the processor in the claim crypto-engine goes 50

20  miles an hour.

21    THE COURT:  Why should a host be slow?

22    MR. ADAMO:  That's the way it's defined and it's used

23  in the context of the alleged invention here.  One of the three

24  main characteristics of the alleged invention is that the

25  processor and the crypto-card works ways faster than the host

E35MINT2

1    processor.

2            THE COURT:  So what.

3            MR. ADAMO:  That's what the claimed invention's

4    alleged benefits are.

5            THE COURT:  Show me.

6            MR. ADAMO:  Your Honor, if you would look at both

7    column 1.

8            THE COURT:  Sit down, Mr. Lim.  You're ahead.

9            MR. ADAMO:  In the summary of the invention section,

10   there is a reference at column 1, line 33 to asymmetric

11   cryptographic processing, column 1.

12           THE COURT:  Let's look.

13           MR. ADAMO:  Column 1, lines 30 through 36, summary of

14   the invention.  It's the second line we can see there, your

15   Honor.  Hardware-based crypto-engine for asymmetric

16   cryptographic processing.  That means we have got two different

17   speeds at least involved in the cryptographic processing.  And

18   then if your Honor at column --

19           THE COURT:  Could be anything.  Asymmetric could be

20   anything.

21           MR. ADAMO:  Your Honor, besides the language in claim

22   4, if your Honor would also look at column 2, starting at line

23   51.

24           THE COURT:  Mr. Lim, write down what you told me so

25   you don't forget.

E35MINT2

1          MR. ADAMO:  You'll see number 3.

2          The asynchronous executing of the hardware modules in

3    much higher speed than the processor communicating with it,

4    heterogeneous processing.  In English that means that the

5    cryptographic engine processor is running at a much higher

6    speed than the processor it's talking to.  That's the host

7    processor.  That's what that means in plain English.  And

8    that's because the RSA and the ECC require the computation of

9    huge amounts of numbers.

10          THE COURT:  I rule that these are perhaps useful in

11   the description of functions, but it's not an essential part of

12   the definition.  It would only complicate and confuse things.

13          So a host processor is, Mr. Lim?

14          MR. LIM:  It is a processor that runs the main

15   computer, central processing unit that runs the main computer.

16          THE COURT:  Central processor that runs --

17          MR. LIM:  The main computer.

18          MR. ADAMO:  Understood, your Honor.  My objection --

19          THE COURT:  Is overruled.

20          Central processor that runs the main computer.  You

21   can't say main computer.  Main means, in effect, host.  How

22   about the other computers?

23          MR. LIM:  The computer system.

24          THE COURT:  Runs the computer system.

25          MR. LIM:  Yes.

E35MINT2

1          THE COURT:  A central processor that runs the computer

2     system.

3          MR. ADAMO:  Your Honor, with respect, there is no

4     support for these terms in the specification in any location

5     and it's inconsistent with the prosecution as well.

6          THE COURT:  Hosts suggests something central on which

7     others focus.  We are talking about a computer system and we

8     are talking about the processors in the computer system.  I

9     think it does.  Overruled.

10         7.  Op-code signal.

11         MR. ADAMO:  The claim would be the best place, your

12    Honor.

13         THE COURT:  A cryptographic controller generates

14    status and interrupt signals for the host processor and

15    generating an op-code signal for the arithmetic unit, the

16    arithmetic unit selecting RSA or ECC mode of operation based on

17    the op-code signal.

18         Op-code is gibberish.  Does it mean operation code?

19         MR. LIM:  Yes.

20         MR. ADAMO:  Might I suggest this.

21         THE COURT:  Op-code will be defined as an operation

22    code.

23         MR. ADAMO:  Which does not mean anything to the jury.

24    If we just say operation code, they are not going to get the

25    sense of what the claim calls out.

E35MINT2

1          May I propose this, your Honor:  A signal capable of

2     indicating an RSA operation when it has a first value and an

3     ECC value when it has another value.  That's the point.  Zero

4     means it's running RSA.  It should run RSA.  1 means it should

5     run ECC.  That's what the claim is saying that the operation

6     code signal is.

7          THE COURT:  Do you go along with that, Mr. Lim?

8          MR. LIM:  We only have one minor objection to that.

9     The word value.

10         THE COURT:  Why don't you and Mr. Adamo talk off the

11    record and see if you come up --

12         MR. ADAMO:  I had suggested signal instead of value.

13         THE COURT:  Sit down with each other off the record

14    and persuade each other.

15         (Discussion off the record)

16         MR. ADAMO:  Your Honor, we had an agreement.  Should I

17    dictate it to the Court?

18         THE COURT:  Yes.

19         MR. ADAMO:  A signal capable of indicating an RSA

20    operation when it has a first characteristic and an ECC

21    operation when it has a different characteristic.

22         MR. LIM:  Yes, your Honor.

23         MR. ADAMO:  Do you have it, your Honor?

24         THE COURT:  A signal capable of indicating an RSA

25    operation when it has one characteristic.

E35MINT2

1        MR. ADAMO:  When it has a first characteristic, your

2   Honor.

3        THE COURT:  When it has one characteristic.  And ECC

4   operation when it has a different characteristic.  How will you

5   tell the jury what RSA and ECC is?

6        MR. LIM:  That's in the specification.  If I can have

7   column 1, line 9 and 10.  That defines what that is.  I am not

8   sure if those words are better for the jury.

9        THE COURT:  Let me see them.

10       MR. ADAMO:  We are looking at the claim.

11       MR. LIM:  We are looking at what RSA and ECC stand

12   for.

13       We can simply say that RSA and ECC are two modes of

14   cryptography or two protocols for cryptography.

15       MR. ADAMO:  I have a two-word add that will do the

16   same thing.  A signal capable of indicating an RSA encryption

17   operation when it has one characteristic and an ECC encryption

18   operation when it has a different --

19       THE COURT:  I think we will do better separating them.

20   I'll add:  RSA and ECC are two modes or protocols for

21   encryption.

22       MR. LIM:  Protocols.  Encryption protocols is what

23   that spec says right there.

24       THE COURT:  Are two protocols for encryption.

25       MR. ADAMO:  Could I hear it again with the Court's

E35MINT2

1  last addition.

2          THE COURT:  A signal capable of indicating an RSA

3  operation when it has one characteristic and an ECC operation

4  when it has a different characteristic.  RSA and ECC are two

5  protocols for encryption.

6          MR. ADAMO:  Thank you, your Honor.

7          THE COURT:  Here is what we will do.  We will e-mail

8  to each of you tomorrow this document I've created which will

9  have the claim term and my proposed construction.  In the claim

10 term I want reference to the line number in the claim.  I will

11 leave out each of your proposals.  I will include the

12 agreements.  I will ask you to review what I have.  And if you

13 feel that for reasons other than I've accepted or rejected

14 today there are other things to comment on, you can add those

15 comments.  I also appreciate if you would look at a little

16 introduction I have of the law, overview of introductions to

17 each of the patents and see if they make sense; if not, to

18 suggest changes.

19         And with regard to the two patents where we didn't do

20 anything, I'll just repeat the information that we have here

21 and leave my construction out.  To the extent that you can

22 agree, please do so.  If it's subject to an objection to what I

23 said is my guides, you will make those objections so you have a

24 clear record.  I propose that we cancel tomorrow so you have

25 time to work together and we will convene at 10:30 Monday.

E35MINT2

1          MR. ADAMO:  I believe there is only one patent left,

2     your Honor.  I think it's '574.  We just did '666.

3          THE COURT:  We did '666.  Yes, sir.

4          MR. LIM:  Your Honor, may I propose a suggestion.  To

5     the extent that the parties are able to work out the

6     differences on the '574 tonight, would your Honor be willing to

7     have a short hearing tomorrow afternoon --

8          THE COURT:  Let's cancel tomorrow.  You have got a lot

9     to do.  In other words, you are thinking that we can do it

10    tomorrow afternoon rather than come back on Monday?  I'm open

11    to that.  2:30.  I'll reserve it.  And if you want it, both of

12    you, or not want it -- Mr. Lim, you call.  I only need to know

13    your separate positions.  If you both agree for tomorrow, it's

14    on.  If you can't both agree, we will do it Monday at 10:30.

15         MR. LIM:  Thank you, your Honor.

16         THE COURT:  I also want to discuss with you what

17    should be our next step.  I would like you, respectively, to

18    suggest where we go.  We can do that on Monday or tomorrow, or

19    I can schedule another day, because you may want to think about

20    what you want to do and talk together and discuss with your

21    clients.  You needn't tell me now.  You needn't tell me now.

22    You can tell me when we are together.  You can say, Judge,

23    let's go on to the next stage, or, Judge, let's schedule a date

24    for the next stage.

25         MR. NAGY:  Your Honor, I was going to suggest that we

E35MINT2

1    take it up tomorrow or Monday.

2              THE COURT:  I'm open to either way.  But there are

3    things that I'm doing that you may not have anticipated.  It

4    doesn't need to be a lot of time.  I can meet with you, for

5    example, next Friday.

6              MR. NAGY:  I think if we are able, perhaps, we can do

7    it tomorrow, or perhaps next Friday.

8              THE COURT:  Either way.

9              MR. LIM:  Thank you, your Honor.

10             THE COURT:  We are recessed.  Thank you very much.

11             (Adjourned to Thursday, March 6, 2014, at 2:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25